2005 ME 57

**Michael FORTIN**

v.

**THE ROMAN CATHOLIC BISHOP
OF PORTLAND**

Supreme Judicial Court of Maine.

Argued: Nov. 16, 2004.
Decided: May 3, 2005.

Sumner H. Lipman, Esq. (orally), Keith R. Varner, Esq., Lipman, Katz & McKee, P.A., Augusta, for plaintiff.

Gerald F. Petruccelli, Esq. (orally), Bradford A. Pattershall, Esq., Petruccelli, Martin & Haddow, LLP, Thomas R. Kelly, Esq., Peter M. Rosenberg, Esq., Robinson, Kriger & McCallum, Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

LEVY, J.

[¶ 1] In this case we consider to what extent the constitutional guarantees of religious freedom contained in the Free Exercise Clause of the First Amendment to the United States Constitution and Article I, section 3 of the Maine Constitution limit the imposition of negligent supervision liability against a religious organization based on tortious acts committed against a child by a member of its clergy.

[¶ 2] Michael Fortin appeals from a judgment entered in the Superior Court (Kennebec County, *Studstrup, J.*) dismissing his complaint against the Roman Catholic Bishop of Portland (the "Diocese") pursuant to M.R. Civ. P. 12(b)(6). Be-

cause we now conclude that Fortin's complaint, as amended, states a cognizable claim against the Diocese, we must vacate the judgment of dismissal and remand for further proceedings.

## I. CASE HISTORY

[¶ 3] Michael Fortin filed a complaint against his childhood priest, Raymond Melville, and the Diocese, a corporation sole,[1] in August 2001. The complaint consists of twelve counts—six against Melville, five against the Diocese, and one against both defendants for punitive damages. The counts against Melville are based on Fortin's allegations that Melville began to sexually abuse him in 1985, when he was thirteen, and that the abuse continued until 1992. The incidents allegedly occurred in Augusta while Fortin was a student at St. Mary's School and an altar boy at St. Mary's Parish. The counts against the Diocese are based on theories of negligence, clergy malpractice, negligent hiring and supervision, breach of fiduciary duty, and canonical agency. Fortin's complaint states that Melville worked for and was supervised by the Diocese at St. Mary's and that, despite being aware that Melville had a "propensity to sexually exploit and abuse young boys, [the Diocese] failed to report [Melville] to law enforcement officials, but rather [concealed from] the parishioners [and] the public, [his] propensities."

[¶ 4] The Diocese notified the court that it intended to file a motion to dismiss on First Amendment grounds, and, following a pretrial conference, the Superior Court stayed all discovery. Both defendants then moved for summary judgments on statute of limitations grounds. The Diocese also moved the court to dismiss under M.R. Civ. P. 12(b)(6) for Fortin's failure to state a claim upon which relief could be granted.

[¶ 5] Prior to the court's decision on the pending motions, Fortin filed several other motions, including a motion for leave to file an amended complaint. The proposed amended complaint sought to add Bishop Joseph J. Gerry as an individual defendant, and it alleged that in March 1990 Bishop Gerry received a letter from an individual who claimed to have been "emotionally, sexually and physically abused" by Melville for a five-year period ending in 1985, and who wrote the letter out of a desire to avoid "[t]he possible tragedy of another young boy being a victim." The amended complaint also alleges that Bishop Gerry replied to the letter's author stating that he would pursue the matter "with the greatest diligence" and address it "vigorously and expeditiously." The complaint added that Bishop Gerry received a second letter in response that stated, "[Y]ou now also bear the responsibility that this does not happen again." Redacted copies of the three letters were attached to the amended complaint as exhibits.

[¶ 6] In a July 2002 order, the trial court denied both defendants' motions for summary judgment, and, relying on our decision in *Swanson v. Roman Catholic Bishop of Portland,* 1997 ME 63, 692 A.2d 441, granted the Diocese's motion to dismiss. The court noted that *Swanson* involved a

---

1. We noted in *Swanson v. Roman Catholic Bishop of Portland* that "[t]he Catholic church is not organized in the fashion of a typical business entity. The 'corporation sole' in the person of The Roman Catholic Bishop of Portland appears to have the financial authority and responsibility for the local presence of the church." 1997 ME 63, ¶ 1 n. 1, 692 A.2d 441, 442 (quotation marks omitted). According to the Diocese's brief, Bishop Edward O'Leary served as Bishop until 1988 and was succeeded by Bishop Joseph Gerry, who served until 2003, who was, in turn, succeeded by Bishop Richard Malone.

counseling and sexual relationship between two adults, while this case involves an adult sexually abusing a child. Nevertheless, the court concluded that "in light of the sweeping language of parts of *Swanson,* this court feels constrained to agree with the church that the decision compels dismissal. Since all the plaintiff's claims against the church depend on application of secular agency princip[les] rejected in *Swanson,* the dismissal will be as to all counts." The court subsequently denied Fortin's motion to amend the complaint. The court explained, that although "[o]rdinarily [it] is quite liberal in granting motions to amend the pleadings, ... the new count would not survive a motion to dismiss [because it] is subject to the same constitutional limitations set forth in the court's [July] order."

[¶ 7] Fortin's claims against Melville proceeded through the pretrial process, and in January 2004, Fortin and Melville stipulated to the court's entry of a $500,000 judgment on counts for sexual assault and battery, and punitive damages. Fortin then appealed from the dismissal of his claim against the Diocese and subsequently moved this Court to remand the case to the Superior Court to permit him to conduct discovery on the issue of the First Amendment's effect on his claims against the Diocese. We granted the motion and remanded to the Superior Court for discovery, but our order did not address the course of further proceedings before the Superior Court. The parties engaged in discovery during the remand period, but neither requested the court to reconsider its prior orders following the completion of the discovery period, nor did they seek further relief from the court pursuant to either M.R. Civ. P. 12(b) or 56.

## II. DISCUSSION

[¶ 8] We address, in order: (A) whether the discovery performed subsequent to the court's order granting the motion to dismiss is relevant to this appeal and whether the court erred by denying Fortin's motion to amend the complaint; (B) whether the court erred by denying the Diocese's motion for a summary judgment based on the statute of limitations; (C) whether, as Fortin claims, the tort of negligent supervision has been recognized in Maine, and whether our decision in *Swanson* should be overruled; (D) whether Fortin's allegations, viewed in their most favorable light, are sufficient to raise the existence of a fiduciary relationship between him and the Diocese; and (E) whether the imposition against the Diocese of negligent supervision liability based on its duty to protect a child with whom it has a fiduciary relationship necessarily infringes on the Diocese's right to the free exercise of religion in violation of the First Amendment of the United States Constitution or Article I, section 3 of the Maine Constitution.

### A. Consideration of Discovery and of the Amended Complaint

[¶ 9] Fortin urges us to consider the discovery materials as part of our review of the court's order dismissing his complaint against the Diocese. He argues that "[t]here would be no reason for the Law Court to order a remand for limited discovery if the Law Court did not intend that such discovery be considered as part of this appeal."

[¶ 10] When we review "a trial court's dismissal of a complaint, we view the facts alleged in the complaint as if they were admitted." *Napieralski v. Unity Church of Greater Portland,* 2002 ME 108, ¶ 4, 802 A.2d 391, 392. "We then 'examine the complaint in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff

to relief pursuant to some legal theory.' " *Id.* (quoting *In re Wage Payment Litig.*, 2000 ME 162, ¶ 3, 759 A.2d 217, 220). "In addition to the allegations in the complaint, we may examine documents attached to the complaint." *Me. Mun. Employees. Health Trust v. Maloney*, 2004 ME 51, ¶ 5, 846 A.2d 336, 338.

[¶ 11] The discovery produced during the remand period was not before the trial court when it decided the Diocese's motion to dismiss. In addition, neither party requested the court to consider the discovery or to reconsider its earlier rulings in light of it. Consequently, we will not consider the discovery as part of our review of the court's dismissal of Fortin's claims against the Diocese pursuant to M.R. Civ. P. 12(b)(6).

[¶ 12] We will, however, consider the allegations of the amended complaint and the exhibits attached to it in reviewing the court's dismissal. The court stated that it was denying the motion to amend the complaint because, in its view, the amendments could not survive a motion to dismiss for the constitutional reasons discussed in its July 2002 order. Because we conclude that the amendments survive dismissal on this basis, the court erred by denying the motion to amend the complaint. Accordingly, we treat the amended complaint as the complaint for purposes of our review.

B. Statute of Limitations

[¶ 13] The Diocese contends that the six-year statute of limitations set forth in 14 M.R.S.A. § 752 (2003) applies to this case. The Diocese points out that the offenses alleged by Fortin occurred at least nine years prior to the commencement of this action and asserts that Fortin's claims are, therefore, time-barred by section 752. Fortin, on the other hand, argues that this action is not time-barred because it is gov-

erned by 14 M.R.S.A. § 752–C(1) (2003), which provides: "Actions based upon sexual acts toward minors may be commenced at any time." Fortin contends that the "based upon" language in section 752–C(1) unambiguously contemplates his action against the Diocese. The Diocese counters that the language unambiguously applies only to actions against the perpetrators of such acts.

[¶ 14] Both Melville and the Diocese moved for summary judgment on statute of limitations grounds. In its July 2002 order, the court denied both defendants' motions for summary judgment, but granted the Diocese's motion to dismiss on First Amendment grounds. Recognizing Melville's right to renew his motion for a summary judgment at a later date, the court stated that his motion was "premature given the limited discovery." The court also determined that with regard to the Diocese, the statute of limitations issue had become moot because the court had granted the Diocese's motion to dismiss. The Diocese subsequently filed a motion to reconsider the denial of its motion for a summary judgment. In an October 2002 order, the court again denied the motion "since trying to decide the issue [at that time] would be deciding it in a discovery vacuum, and compelling discovery would be inconsistent with the church's dismissal." The court noted that it had specifically curtailed discovery at the Diocese's request. Moreover, the court explained that "[m]otions for summary judgment based upon a statute of limitations typically become very fact specific."

[¶ 15] Fortin raised several issues of disputed fact in response to the Diocese's summary judgment motion. For example, he asserted that the Diocese had on several occasions sent Melville out of state for lengthy periods in an effort to fraudulently conceal its own negligence, thus toll-

ing the statute of limitations in the event the six-year limitations period applies. *See* 14 M.R.S.A. §§ 859, 866 (2003). Consequently, the trial court acted within the scope of its discretion when it concluded that its consideration of the statute of limitations issue would be premature. Because we vacate the trial court's order granting the Diocese's motion to dismiss, the Diocese may again move the court for entry of a summary judgment based on the statute of limitations, but only after further development of the record.

## C. Negligent Supervision

[¶ 16] Although Fortin asserted six separate counts against the Diocese,[2] his argument before the Superior Court and before us characterized the Diocese's liability for Melville's intentional torts as arising from a fiduciary duty the Diocese owed him. Fortin contends that the Diocese breached that duty by negligently supervising Melville after learning of Melville's propensity to sexually abuse boys and failing, among other things, to report Melville to the police and to notify members of the parish. Accordingly, we analyze the court's grant of the Diocese's motion to dismiss on that basis.

[¶ 17] Fortin specifically asserts that the court erred in dismissing his complaint against the Diocese because (1) we have previously recognized the tort of negligent supervision, and (2) our decision in *Swanson* was wrongly decided and should be overruled. Although we do not accept either proposition, we conclude that Fortin's complaint against the Diocese states a claim upon which relief may be granted and should not have been dismissed.

### 1. Status of Negligent Supervision in Maine

[¶ 18] Fortin asserts that we adopted the tort of negligent supervision in *McLain v. Training & Development Corp.*, 572 A.2d 494 (Me.1990). In that case, McLain, a former student of a Job Corps training program, sued the program for the tortious conduct of one of its employees. *Id.* at 496. McLain's claims against the program were based on both the program's direct negligence in its hiring and supervision of the employee and its vicarious liability for the negligence and assault and battery committed by the employee. *Id.* We affirmed the judgment entered against the program, concluding that the jury could have found the program liable based on either of McLain's theories of liability:

> On the record before it the jury could rationally find that TDC had failed to supervise [the employee] properly.... Also, the jury could rationally find from the evidence that [the employee's] employment made possible the tortious assault and battery he imposed upon McLain, rendering TDC liable for all of McLain's injuries at [the employee's] hand, on the alternative theory of vicarious liability.

*Id.* at 498.

[¶ 19] As the Diocese points out, it is unclear whether *McLain* was decided on a theory of negligent supervision or respondeat superior. We were not called on in *McLain*, however, to answer the question of whether an employer's negligent supervision of an employee violates a duty the employer owes to those harmed by the employee. *See id.* On five occasions since *McLain* was decided, however, we have made it clear that we have not yet adopted

---

2. We consider the facts asserted by Fortin in his amended complaint in conjunction with our analysis of the claim against the Diocese, but we do not address Fortin's new count

against Bishop Gerry because he has not appeared in this action in his individual capacity and, as such, has not had the opportunity to respond to the amended complaint.

or rejected a cause of action for negligent supervision by an employer.[3] *See Korhonen v. Allstate Ins. Co.*, 2003 ME 77, ¶ 12 n. 4, 827 A.2d 833, 837 ("Negligent supervision is generally considered in the context of the duty an employer might owe for the conduct of an employee, and is a duty that we have not previously recognized."); *see also Mahar v. StoneWood Transp.*, 2003 ME 63, ¶ 10, 823 A.2d 540, 543; *Napieralski*, 2002 ME 108, ¶ 6, 802 A.2d at 392; *Hinkley v. Penobscot Valley Hosp.*, 2002 ME 70, ¶ 16, 794 A.2d 643, 647; *Swanson*, 1997 ME 63, ¶ 9, 692 A.2d at 443–44.

[¶ 20] As aptly stated by Judge Woodcock of the U.S. District Court, "[t]he best [that one] can say is the Law Court has implied it will rule on whether the tort exists if the proper set of facts comes before it." *Gomes v. Univ. of Me. Sys.*, 304 F.Supp.2d 117, 133 (D.Me.2004).

2. Whether *Swanson* Should Be Overruled

[¶ 21] Fortin asserts that we should overrule *Swanson* because, as evidenced by the trial court's decision in the present case, *Swanson* created "blanket tort immunity" for all actions of the Diocese relating to claims of sexual abuse by members of the clergy. He claims that this result is contrary to public policy, particularly as it relates to intentional torts committed against children, because it "prevents any judicial review of the actions of the Diocese in placing a known pedophile in an unsupervised position of contact with children." The Diocese agrees that negligent supervision liability cannot be imposed against it unless we overrule *Swanson.*

[¶ 22] In *Swanson*, the plaintiffs, a married couple, claimed that their priest initiated a sexual relationship with the wife while they were engaged in marital counseling with him. 1997 ME 63, ¶¶ 2–3, 692 A.2d at 442. After the husband discovered the relationship, the wife filed a complaint for divorce, and while the divorce was pending, the couple's son committed suicide. *Id.* ¶¶ 3–4, 692 A.2d at 442. The couple then filed a complaint against the Roman Catholic Bishop of Portland for negligent supervision of the priest. *Id.* ¶ 4, 692 A.2d at 442.

[¶ 23] After the parties engaged in considerable discovery, the Superior Court reported the matter to this Court. *Id.* ¶ 5, 692 A.2d at 442. We held that even if we were to recognize a negligent supervision cause of action, the right to the free exercise of religion guaranteed by the First Amendment to the United States Constitution and Article I, section 3 of the Maine Constitution barred its application to church governance on *Swanson's* facts.[4]

3. Section 317 of the RESTATEMENT (SECOND) OF TORTS describes an employer's duty to control his or her employees in a negligent supervision cause of action:

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
(a) the servant
(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
(ii) is using a chattel of the master, and
(b) the master
(i) knows or has reason to know that he has the ability to control his servant, and
(ii) knows or should know of the necessity and opportunity for exercising such control.
*Napieralski v. Unity Church of Greater Portland*, 2002 ME 108, ¶ 7, 802 A.2d 391, 393 (quoting RESTATEMENT (SECOND) OF TORTS § 317 (1965)).

4. The First Amendment to the United States Constitution provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise there-

*Id.* ¶¶ 9, 12, 692 A.2d at 444–45. We arrived at this result after weighing the societal interests in creating a civil duty of supervision against the interference with religious freedom that would result:

> We conclude that, *on the facts of this case,* imposing a secular duty of supervision on the church and enforcing that duty through civil liability would restrict its freedom to interact with its clergy in the manner deemed proper by ecclesiastical authorities and would not serve a societal interest sufficient to overcome the religious freedoms inhibited.

*Id.* ¶ 13, 692 A.2d at 445 (emphasis added). In balancing the relevant interests, therefore, we addressed the facts presented in *Swanson* and neither purported to establish a blanket tort immunity for religious organizations, nor intended the decision to be the final word on the subject. *Id.*

[¶ 24] Two years later, in *Bryan R. v. Watchtower Bible & Tract Society of New York, Inc.,* we addressed claims against the Jehovah's Witnesses for breach of fiduciary duty and intentional and negligent infliction of emotional distress. 1999 ME 144, ¶¶ 3, 15, 25, 30, 738 A.2d 839, 842, 845, 847–48. In that case, an adult member of the church was alleged to have sexually abused a boy who was a member of the same congregation. *Id.* ¶ 1, 738 A.2d at 842. The boy asserted that the church had "a duty to protect its members from each other, at least when the church and its agents are aware of a potential danger posed by a member." *Id.* ¶ 10, 738 A.2d at 843.

[¶ 25] Because the adult member was not alleged to have been an employee or agent of the church, we declined to address whether the *Swanson* balancing test "require[s] a different result when a child, rather than an adult, is injured by an agent of the church." *Id.* ¶ 9 n. 2, 738 A.2d at 843. We did address, however, whether the church had a duty to protect the boy from the actions of dangerous third parties. *Id.* ¶ 11, 738 A.2d at 844. In doing so, we stated that the general rule is that an actor has no duty to protect others from harm caused by third parties. *Id.* ¶ 12, 738 A.2d at 844. We also recognized an exception to the rule: when a "special relationship" exists, an "actor [may] be found to have a common law duty to prevent harm to another caused by a third party." *Id.* ¶ 14, 738 A.2d at 845 (citing RESTATEMENT (SECOND) OF TORTS § 315(b) (1965)); *see also Korhonen,* 2003 ME 77, ¶ 12 n. 4, 827 A.2d at 837 (discussing RESTATEMENT (SECOND) OF TORTS § 324(a) cmt. b (1965), which recognizes the duty of "one who takes charge of another who by reason of his youth is incapable of caring for himself").[5]

---

of[.]" U.S. CONST. amend. I. The First Amendment and Article I, section 3 of the Maine Constitution, limit the exercise of state power through all three branches of government, including the judiciary. *See Kreshik v. Saint Nicholas Cathedral of the Russian Orthodox Church of N. Am.,* 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960); *Swanson,* 1997 ME 63, ¶¶ 7–8, 692 A.2d at 443.

5. Similarly, Prosser and Keeton recognize that although the law does not generally impose a duty to anticipate that others may commit an intentional tort or criminal act against another:

> There are ... situations, in which either a special responsibility resting upon the defendant for the protection of the plaintiff, or an especial temptation and opportunity for criminal misconduct brought about by the defendant, will call upon [the defendant] to take precautions against it. The responsibility for protection may arise out of a contract, by which the defendant has agreed to provide it; or it may be founded upon some relation existing between the parties, such as ... school and pupil....

W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS 201–02

[¶ 26] The special relationship asserted by the plaintiff in *Bryan R.* was grounded in the notion that the church owed him a fiduciary duty as a member of its congregation. 1999 ME 144, ¶ 15, 738 A.2d at 845. We noted that "[a] fiduciary duty will be found to exist . . . only in circumstances where the law will recognize both the disparate positions of the parties and a reasonable basis for the placement of trust and confidence in the superior party in the context of specific events at issue," *id.* ¶ 20, 738 A.2d at 846, and concluded that the boy had failed to allege sufficient facts to support his contention of a fiduciary duty, *id.* ¶ 24, 738 A.2d at 847. "In order to survive a motion to dismiss a claim for breach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship." *Id.* ¶ 21, 738 A.2d at 846–47. We noted that the complaint failed to allege "that there were aspects of Bryan's relationship with the church that were distinct from those of its relationships with any other members, adult or child." *Id.* ¶ 23, 738 A.2d at 847. We declined to recognize "a generalized fiduciary duty on the part of the church to protect members of its congregation from other members." *Id.* ¶ 24, 738 A.2d at 847.[6]

[¶ 27] More recently, in *Napieralski*, we considered a claim against the Unity Church in which it was alleged that a member of its clergy forced Napieralski to engage in sexual acts. 2002 ME 108, ¶ 2, 802 A.2d at 392. The reverend of the church approached Napieralski—an insurance agent and member of his church—about obtaining life insurance. *Id.* They agreed to meet at the reverend's home, which was owned by the church, where he allegedly forced her to engage in sexual acts. *Id.*

[¶ 28] Napieralski brought an action against the church, claiming negligent supervision of its reverend. *Id.* ¶ 3, 802 A.2d at 392. We concluded that because the case involved contact between adults who were addressing a private matter at the reverend's residence, Napieralski's claim was "beyond the scope of any traditional negligent supervision action" and was properly dismissed. *Id.* ¶¶ 8–10, 802 A.2d at 393. Accordingly, we did not "address *Swanson* or the constitutional issues it raised." *Id.* ¶ 11, 802 A.2d at 393.

[¶ 29] As demonstrated by our decisions, the constitutional guarantee of

---

(W. Page Keeton ed., 5th ed.1984) (footnotes omitted).

6. We also concluded in *Bryan R. v. Watchtower Bible & Tract Society of New York, Inc.* that the trial court properly dismissed the boy's emotional distress claims. 1999 ME 144, ¶¶ 29, 32, 738 A.2d 839, 848–49. In order to prevail on the intentional infliction of emotional distress claim, we would have been required to address "the church's failure to excommunicate [the boy's alleged abuser], its failure to shun him, and its eventual decision to allow [him] to . . . resume a position of leadership and respect within the church." *Id.* ¶ 26, 738 A.2d at 847. Doing so would have required a secular court's interference "in matters concerning religious doctrine or organization," because "[a] religious organization's decisions and actions when providing advice, counsel, or religious discipline to its members will be based on the particular religious beliefs of the organization." *Id.* ¶ 28, 738 A.2d at 848. Such an inquiry "would insert the State into church matters in a fashion wholly forbidden by the Free Exercise Clause of the First Amendment." *Id.* In addition, we concluded that the trial court did not err in dismissing the boy's negligent infliction of emotional distress claim because the relationship between churches and their members is not "the type that would give rise to a duty to avoid psychic injury to those members, and we could not do so without inquiring into the ecclesiastical relationship whose components are not within the purview of the secular courts." *Id.* ¶ 32, 738 A.2d at 849.

religious freedom mandates that we carefully balance the relevant societal interests and the potential interference with religious freedom when assessing claims against religious organizations based on allegations of abusive conduct by members of the clergy. *Swanson* did not create blanket tort immunity for all actions of the Diocese relating to claims of sexual abuse by its clergy. *See* 1997 ME 63, ¶ 13, 692 A.2d at 445. *Bryan R.* recognized that a "special relationship" between a religious organization and a victim of clergy sexual abuse may give rise to a duty on the part of the organization to prevent harm caused by the intentional acts of its clergy. 1999 ME 144, ¶ 14, 738 A.2d at 845. Accordingly, we are not compelled to overrule *Swanson* as an antecedent to determining whether Fortin's claim against the Diocese may proceed without violating its constitutional right to the free exercise of religion.[7]

[¶ 30] We turn then to consider first whether Fortin's amended complaint, viewed in a light most favorable to the plaintiff, asserts facts constituting a special relationship "with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship," *Bryan R.*, 1999 ME 144, ¶ 21, 738 A.2d at 847; and second, whether a fiduciary duty can be imposed on the Diocese without violating constitutional protections.

### D. Fiduciary Relationship

[¶ 31] Fortin's claim of a fiduciary relationship is centered on his assertion that throughout the seven-year period that he was abused by Melville, he was both a parochial school student and an altar boy at St. Mary's. In addition, his complaint alleges that:

> The defendants knew that the parents of Michael Fortin ... suffered from illness that limited to some degree their involvement in raising their son. The defendants were trusted with a special relationship in terms of the religious training and education of Michael Fortin. Defendants violated said special relationship and trust.

[¶ 32] Fortin's assertion of a particularized involvement in the activities of the church as both a parochial school student and an altar boy distinguishes his status from that of a general member of the Diocese. One can reasonably infer that his involvement required that he be physically present at St. Mary's more often than

---

7. A court is justified in overruling established precedent when:

> (1) the court is convinced that the rule of the prior decision operates harshly, unjustly and erratically to produce, in its case-by-case application, results that are not consonant with prevailing, well-established conceptions of fundamental fairness and rationally-based justice, (2) that *conviction is* buttressed by more than the commitment of the individual justices to their mere personal policy preferences, that is, by the substantial erosion of the concepts and authorities upon which the former rule is founded and that erosion is exemplified by disapproval of those conceptions and authorities in the better-considered recent cases and in authoritative scholarly writings, (3) the former rule is the creation of the court itself in the legitimate performance of its function in filling the interstices of statutory language by *interpretation and construction of* vague, indefinite and generic statutory terms, (4) the Legislature has not, subsequent to the court's articulation of the former rule, established by its own definitive and legitimate pronouncement either specific acceptance, rejection or revision of the former rule as articulated by the court, and (5) the court can avoid the most severe impact of an overruling decision upon reliance interests that may have come into being during the existence of the former rule by creatively shaping the temporal effect of the new rule articulated by the holding of the overruling case.

*Myrick v. James*, 444 A.2d 987, 1000 (Me. 1982) (quotation marks omitted).

a general member and that he have substantially greater day-to-day contact with members of the clergy and faculty than would a general member. Considered together with his claim that his parents' illness was known to the Diocese and limited their involvement in raising him, Fortin's assertion of a fiduciary relationship with the Diocese is far more detailed than that asserted in the complaint in *Bryan R.*, which failed to allege any "aspects of Bryan's relationship with the church that were distinct from those of its relationships with any other members, adult or child." *Id.* ¶ 23, 738 A.2d at 847.

[¶ 33] In *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, which was decided subsequent to our opinion in *Swanson*, the Second Circuit Court of Appeals recognized that a special relationship gives rise to a duty of due care on the part of a religious organization. 196 F.3d 409, 430 (2nd Cir.1999). There, the court concluded that there was sufficient evidence for a jury to find the existence of a fiduciary relationship between the Bridgeport Roman Catholic Diocese and a former student who, as a minor, had been sexually abused by a priest. *Id.* at 413, 429–30. The court pointed out that the plaintiff had been a student at a diocesan school that employed the priest who committed the abuse, and that the Diocese knew that the plaintiff had a "special and privileged relationship" with the priest as a result of his membership in a small group of boys mentored by the priest. *Id.* at 429. These facts supported the conclusion that "the Diocese's relationship with Martinelli, based on the particulars of his ties to [the priest] and the Diocese's knowledge and sponsorship of that relationship, was of a fiduciary nature." *Id.*[8]

[¶ 34] The allegations underlying Fortin's claim of a fiduciary relationship with the church are similar to those considered in *Martinelli* and are sufficient to survive the Diocese's motion to dismiss. Fortin's prolonged and extensive involvement with the church as a student and altar boy distinguish him from a child, such as the plaintiff in *Bryan R.*, or an adult, who asserts nothing more than general membership in a religious organization. A child who is both a student and an altar boy is subject to the supervision, control, and authority of the Diocese on a daily basis. At its very core, this is a relationship marked by the "great disparity of position and influence between the parties" that is a hallmark of a fiduciary relationship. *Morris v. Resolution Trust Corp.*, 622 A.2d 708, 712 (Me.1993).

[¶ 35] The question of whether one party owes a fiduciary or other duty of due care to another is a question of law. *McPherson v. McPherson*, 1998 ME 141, ¶ 8, 712 A.2d 1043, 1045. Our approach to this question is informed by "the hand of history, our ideals of morals and justice, the convenience of administration of the

8. *See also Isely v. Capuchin Province*, 880 F.Supp. 1138, 1142, 1155, 1157 (E.D.Mich. 1995) (concluding that a seminary owed a duty to warn/duty to prevent the abuse of the plaintiff, a former seminarian, by priests employed by the seminary who the administrators knew or should have known had a history of sexually abusing others); *Moses v. Diocese of Colo.*, 863 P.2d 310, 314 (Colo.1993) (holding that the First Amendment did not relieve a church from liability for breach of fiduciary duty where a priest engaged in sexual relations with a mentally‑ill parishioner he was counseling). *But see H.R.B. v. J.L.G.*, 913 S.W.2d 92, 98 (Mo.Ct.App.1995) (refusing to recognize a breach of fiduciary duty action against a church for clergy sexual misconduct because "defining the scope of fiduciary duty owed persons by their clergy ... would require courts to define and express the standard of care followed by reasonable clergy of the particular faith involved, which in turn" would result in the court's excessive entanglement with religion).

rule, and our social ideas as to where the loss should fall." *Trusiani v. Cumberland & York Distribs., Inc.*, 538 A.2d 258, 261 (Me.1988) (quoting William L. Prosser, *Palsgraf Revisited*, 52 MICH. L. REV. 1, 15 (1953)). In *Gafner v. Down East Community Hospital*, we were urged to recognize a new theory of corporate liability. 1999 ME 130, ¶ 40, 735 A.2d 969, 979. In declining to do so, we noted that the "proposed theory of [liability had] not yet gained significant acceptance in other jurisdictions and [had] not been addressed by our own Legislature." *Id.* ¶ 41, 735 A.2d at 979.

[¶ 36] Unlike the new theory of liability considered in *Gafner*,[9] the imposition of negligent supervision liability based on an actor's special relationships with children and other vulnerable members of society has been accepted in other jurisdictions [10] and, in one discrete respect, has been addressed by our Legislature by its adoption of laws that mandate that school officials, members of the clergy, and other designated reporters report suspected child abuse. *See* 22 M.R.S.A. § 4011–A(1)(A)(27) (Supp. 2004); *see also* 22 M.R.S.A. § 3477(1)(A)(23) (Supp.2004) (requiring members of the clergy to report the suspected abuse of an incapacitated or dependent adult). Also, it is not a duty that we are required to create "from whole cloth." *Gafner*, 1999 ME 130, ¶ 42, 735 A.2d at 979. For at least forty years, section 315(b) of the RESTATEMENT (SECOND) OF TORTS has recognized an actor's duty to protect from harm those individuals with whom the actor has a special relationship.

---

9. In *Gafner v. Down East Community Hospital*, the plaintiffs proposed a new "theory of corporate liability for failure to have explicit policies in place controlling the actions of independent physicians." 1999 ME 130, ¶ 40, 735 A.2d 969, 979. We chose not to adopt the proposed theory because it had "not yet gained significant acceptance in other jurisdictions and [had] not been addressed by our own Legislature." *Id.* ¶ 41, 735 A.2d at 979.

10. *See, e.g., Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 413, 429–30 (2nd Cir.1999); *Moses*, 863 P.2d at 314; *Sabia v. State*, 164 Vt. 293, 669 A.2d 1187, 1190, 1195–96, 1199 (1995) (concluding that a special relationship formed between a state agency and several children when the agency learned that the children were being sexually abused by their stepfather and holding that the agency had a duty to protect the children, the breach of which could form the basis of a suit against the state); *Marquay v. Eno*, 139 N.H. 708, 662 A.2d 272, 279–80 (1995) (imposing on high school officials a duty to protect students from school employees who the officials know or should know pose a threat to students because the officials, by reason of their supervisory responsibility, have a special relationship with their students); *Brown v. Knight*, 362 Mass. 350, 285 N.E.2d 790, 791–92 (1972) (holding that a summer school operator had a duty to protect a child in her care from foreseeable harm, "including a duty to take affirmative protective acts and a duty to protect [the child] from the foreseeable conduct of third persons").

Other jurisdictions have imposed liability on religious organizations for negligently supervising clergy members without the requirement of a special relationship. *See, e.g., Malicki v. Doe*, 814 So.2d 347, 365 (Fla.2002) (concluding that the First Amendment does not prevent imposing liability on a Catholic church for negligently supervising a priest "who sexually assaults and batters a minor or adult parishioner"); *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 654 N.Y.S.2d 791, 793–96 (N.Y.App.Div.1997) (holding that negligent supervision claims survived a motion to dismiss because the First Amendment does not bar the imposition of liability on a church for a priest's sexual abuse of a minor); *Smith v. O'Connell*, 986 F.Supp. 73, 75 (D.R.I.1997); *Martinez v. Primera Asemblea De Dios, Inc.*, No. 05–96–01458–CV, 1998 Tex.App. LEXIS 2869, at *1–2, 11 & n. 6, 1998 WL 242412, at * 1, 3 & n. 6 (Tex.Ct.App. May 15, 1998) (reversing dismissal of a parishioner's negligence claims against a church for a church elder's sexual assaults against the parishioner).

[¶ 37] Fortin has asserted the existence of a special relationship that ineluctably involved the actual placement of trust, as well as a substantial disparity of power and influence between him and the Diocese. By its very nature, such a special relationship renders a child vulnerable to the possibility of abuse at the hands of a miscreant employee. An established and close connection between a child and an organization, whether religious, academic, or otherwise, is a reasonable basis, informed by both common sense and common experience, to impose a duty on the organization to prevent harm to the child.

[¶ 38] When viewed in the most positive light, Fortin's allegations establish a special relationship between him and the Diocese as his fiduciary. Such a relationship gives rise to a duty to protect on the part of the Diocese if the Diocese has reason to believe that a priest such as Melville poses a substantial risk of harm to a child in Fortin's circumstances. The duty does not exist simply because of Fortin's status as a student and alter boy, but because of the added assertion that the Diocese knew or should have known of the risk of harm posed by the priest who abused Fortin. *See Brewer v. Roosevelt Motor Lodge,* 295 A.2d 647, 651 (Me.1972) (stating that "[t]he risk reasonably to be perceived within the range of apprehension delineates the duty to be performed and the scope thereof"); *Isely v. Capuchin Province,* 880 F.Supp. 1138, 1155 (E.D.Mich.1995) (concluding that a seminary owed a duty to the plaintiff, a former seminarian, from priests employed by the seminary who the administrators knew or should have known had histories of sexually abusing others); *see also Sabia v. State,* 164 Vt. 293, 669 A.2d 1187, 1190, 1195–96, 1199 (1995).

[¶ 39] Accordingly, if a plaintiff asserts the existence of facts that, if proven, establish a special relationship with a defendant in accordance with section 315(b) of the RESTATEMENT (SECOND) OF TORTS, an action may be maintained against the defendant for negligent supervision liability in accordance with section 317 of the Restatement. Apart from the specific context of relationships addressed by section 315(b) of the Restatement, we need not and, therefore, do not address in this opinion whether negligent supervision liability may be imposed in other circumstances.

### E. Constitutional Issues

[¶ 40] Our inquiry does not end with our conclusion that the Diocese, as Fortin's fiduciary, may have owed him a duty to protect him from harm. We turn next to consider the Diocese's claim that our recognition of such a duty under the circumstances of this case will necessarily infringe on its free exercise of religion in violation of the First Amendment of the United States Constitution and Article I, section 3 of the Maine Constitution.

#### 1. Free Exercise Clause of the First Amendment

[¶ 41] The First Amendment guarantees religious freedom by providing: "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof.*" U.S. CONST. amend. I (emphasis added). The Free Exercise Clause of the First Amendment is made applicable to the states through the Fourteenth Amendment. *Cantwell v. Conn.,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The Diocese, relying principally on *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), and *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), asserts that the impo-

sition of a fiduciary-based duty of due care in this case will violate the Free Exercise Clause because it will necessarily encroach upon the Diocese's authority "to decide such things in accordance with their own theological premises and governance traditions." We consider both decisions in some detail because they are central to our resolution of the Diocese's claim of immunity from suit based on its free exercise rights.

[¶ 42] *Smith* involved the denial of workers compensation benefits for two employees of a private drug rehabilitation organization. 494 U.S. at 874, 110 S.Ct. 1595. The organization fired the workers because they ingested peyote, in violation of Oregon law, for sacramental purposes at a ceremony of the Native American Church, to which they belonged. *Id.* In an opinion by Justice Scalia, a five-member majority of the Supreme Court concluded that there was no violation of the Free Exercise Clause because if prohibiting the exercise of religion is not the object of a law, "but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." 494 U.S. at 873, 878, 110 S.Ct. 1595. The Court noted that it has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." [11] *Id.* at 878–79, 110 S.Ct. 1595.

[¶ 43] Justice O'Connor, writing for four members of the Court, concurred in the result, but criticized the majority for "dis-regard[ing] [the Court's] consistent application of free exercise doctrine to cases involving generally applicable regulations that burden religious conduct." *Id.* at 891–92, 110 S.Ct. 1595. Instead, she wrote, the Court should adhere to its established Free Exercise Clause jurisprudence:

> To say that a person's right to free exercise has been burdened, of course, does not mean that he has an absolute right to engage in the conduct. Under our established First Amendment jurisprudence, we have recognized that the freedom to act, unlike the freedom to believe, cannot be absolute. Instead, we have respected both the First Amendment's express textual mandate and the governmental interest in regulation of conduct by requiring the government to justify any substantial burden on religiously motivated conduct by a compelling state interest and by means narrowly tailored to achieve that interest.

*Id.* at 894, 110 S.Ct. 1595 (citations omitted). Applying this standard, she concluded that although Oregon's criminal prohibition "places a severe burden on the ability of respondents to freely exercise their religion," *id.* at 903, 110 S.Ct. 1595, the "uniform application of [the] prohibition is essential to accomplish its overriding interest in preventing the physical harm caused by the use of a Schedule I controlled substance," *id.* at 905, 110 S.Ct. 1595 (quotation marks and citations omitted).[12]

**11.** The Court restricted its holding, however, so that it is not applicable to cases in which the Free Exercise Clause is considered in conjunction with other constitutional protections, such as freedom of speech, or to state unemployment compensation claims cases governed by the test announced in *Sherbert v. Verner*, 374 U.S. 398, 402–03, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), where "governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest." *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 882–83, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

**12.** The three justices who joined Justice O'Connor's concurrence disagreed with her ultimate conclusion that there was no First

**1224**

[¶ 44] The test established by the majority in *Smith* was subsequently applied in *Lukumi*, in which a church challenged the constitutionality of Hialeah city ordinances that, among other things, outlawed the sacrificial killing of animals. 508 U.S. at 524, 526, 113 S.Ct. 2217. At the time, the church had announced plans to construct a house of worship in Hialeah for the purpose of practicing the Santeria faith, which includes animal sacrifice as a part of its rituals. *Id.* at 525–26, 113 S.Ct. 2217. The Supreme Court unanimously concluded that the ordinances unconstitutionally infringed upon the church's free exercise of religion, but divided as to the reasons why. *See id.* at 522, 557, 559, 577, 113 S.Ct. 2217.

[¶ 45] Justice Kennedy, writing for a majority of the Court,[13] analyzed the ordinances in a manner that built on the approach adopted in *Smith:*

In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is *neutral* and of *general applicability* need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. *Neutrality and general applicability* are interrelated, and, as becomes apparent in this case, failure to satisfy one requirement is a likely indication that the other has not been satisfied. A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.

These ordinances fail to satisfy the *Smith* requirements.

*Id.* at 531–32, 113 S.Ct. 2217 (emphasis added) (citations omitted.)

[¶ 46] Justice Kennedy concluded that the ordinances failed the test of neutrality because, although the ordinances were facially. neutral, the Free Exercise Clause "extends beyond facial discrimination. The Clause forbids subtle departures from neutrality and covert suppression of particular religious beliefs." *Id.* at 534, 113 S.Ct. 2217 (quotation marks and citations omitted). The record established that the Santerian belief in ritualistic animal sacrifice was the ordinances' target, and that "[a]part from the text, the effect of a law in its real operation is strong evidence of its object." *Id.* at 535, 113 S.Ct. 2217. The Court also concluded that the ordinances failed the test of general applicability: "Despite the city's proffered interest in preventing cruelty to animals, the ordinances are drafted with care to forbid few killings but those occasioned by religious sacrifice." *Id.* at 542–43, 113 S.Ct. 2217. Because the ordinances were substantially underinclusive in achieving their stated purpose of preventing cruelty to animals and protecting public health—they did not, for example, prohibit sport fishing or the euthanasia of stray animals—they failed the test of general applicability. *Id.* at 537, 543–44, 113 S.Ct. 2217. Not only did the ordinances fail the tests of neutrality and general applicability, they also could not survive the second level of scrutiny recognized in *Smith*, requiring a law that

Amendment violation. *Smith*, 494 U.S. at 907, 909, 110 S.Ct. 1595 (Blackmun, J., dissenting). In a separate dissent, Justice Blackmun concluded "that Oregon's interest in enforcing its drug laws against religious use of peyote is not sufficiently compelling to outweigh respondents' right to the free exercise of their religion." *Id.* at 921, 110 S.Ct. 1595.

**13.** Justice Kennedy wrote for a majority of the Court with respect to all but one part of his opinion. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 522, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). We do not draw upon that portion of the opinion as part of our analysis in this case.

fails those tests to be narrowly tailored and to advance a compelling government interest. *Id.* at 546, 113 S.Ct. 2217.

[¶ 47] The Diocese urges us to consider, in particular, Justice Souter's concurring opinion in *Lukumi*, in which he advanced the view of the four concurring justices in *Smith* and wrote critically of the Court's adherence to the *Smith* rule that the Free Exercise Clause is not violated so long as a law satisfies the criteria of "neutrality" and "general applicability." *See Lukumi*, 508 U.S. at 559, 113 S.Ct. 2217. Justice Souter specifically took issue with the Court's treatment of the concept of neutrality as only demanding *formal* neutrality, that is, "neutrality, which as a free-exercise requirement would only bar laws with an object to discriminate against religion." *Id.* at 561–62, 113 S.Ct. 2217. He viewed "neutrality" as also requiring *substantive* neutrality, that is, "in addition to demanding a secular object, [it also] generally require[s] government to accommodate religious differences by exempting religious practices from formally neutral laws." *Id.* at 562, 113 S.Ct. 2217. The defect with the *Smith* standard under this view is that it excludes from the protection of the Free Exercise Clause laws of general applicability that satisfy formal neutrality, but, when applied, unduly burden the free exercise of religion: "[W]e have said, [o]ur cases have established that [t]he free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." *Id.* at 565, 113 S.Ct. 2217 (quotation marks omitted).

[¶ 48] Justice Souter's broader view of neutrality is consistent with the formulation of neutrality applied in earlier decisions such as *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

In that case, the Court affirmed the invalidation of the convictions of Amish parents who were prosecuted for violating Wisconsin's mandatory school attendance law for children under the age of sixteen. *Id.* at 207, 92 S.Ct. 1526. The Court stated, "A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Id.* at 220, 92 S.Ct. 1526.

[¶ 49] In evaluating Fortin's claim, the result is the same whether we apply the *Smith* standard or the more rigorous standard advanced by Justice Souter's *Lukumi* concurrence. Judicial imposition of a civil duty based on the existence of a special relationship, as postulated in section 315(b) of the RESTATEMENT (SECOND) OF TORTS, satisfies the *Smith* standard because it is a legal requirement that (1) is facially neutral and does not overtly or covertly target religious beliefs or practices, and (2) satisfies the requirement of general applicability because it applies to all individuals and organizations, not just religious organizations. As we recognized in *Swanson*, courts do not inhibit the free exercise of religion by applying neutral principles of law to a civil dispute involving members of the clergy. 1997 ME 63, ¶ 8, 692 A.2d at 443.

[¶ 50] The Diocese asserts that such a civil duty cannot meet the test of neutrality because applying "uniform standards of management to churches and secular corporations alike is not neutral because it ignores their fundamental differences and fails to recognize that churches are constitutionally protected in their beliefs and practices." This assertion implicates the more rigorous standard of constitutional review advanced by Justice Souter in his *Lukumi* concurrence. The Free Exercise Clause does

not, however, immunize the Diocese from any interference in its internal hierarchical relationships so long as the application of neutral principles of law defers " 'to the resolution of [any] doctrinal issue by the authoritative ecclesiastical body.' " *Swanson*, 1997 ME 63, ¶ 8, 692 A.2d at 443 (quoting *Jones v. Wolf*, 443 U.S. 595, 604, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979)). As Justice O'Connor stated in *Smith*, religious conduct is not "automatically immune from all governmental regulation simply because it is motivated by ... sincere religious beliefs." 494 U.S. at 897, 110 S.Ct. 1595 (O'Connor, J., concurring).

[¶ 51] What most clearly distinguishes the Diocese's free exercise claim in this case from *Smith, Lukumi,* and the other free exercise decisions of the U.S. Supreme Court cited by the Diocese is the Diocese's failure to identify a specific religious doctrine or practice that will be burdened if Fortin's claim is not dismissed. In each of the decisions cited, the Court applied the Free Exercise Clause in connection with a specific doctrine or practice that its adherents claimed would be infringed upon by state action. *See Lukumi*, 508 U.S. at 523–24, 113 S.Ct. 2217 (addressing the Free Exercise Clause as applied to the animal sacrifice practices of the Santeria religion); *Smith*, 494 U.S. at 874, 110 S.Ct. 1595 (addressing the Free Exercise Clause as applied to the use of peyote as a sacramental ritual prescribed by a Native American church); *Jones*, 443 U.S. at 602, 99 S.Ct. 3020 (addressing the Free Exercise Clause as applied to a civil court's reliance on specific religious doctrines to resolve a church's internal property dispute); *Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 708–09, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (addressing the Free Exercise Clause as applied to the allocation of hierarchical authority within a church as directed by the church's govern-

ing documents); *Sherbert v. Verner*, 374 U.S. 398, 399–401, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (addressing the Free Exercise Clause as applied to Seventh–Day Adventist doctrine prohibiting work on its Sabbath); *Yoder*, 406 U.S. at 210, 92 S.Ct. 1526 (addressing the Free Exercise Clause as applied to Amish doctrines concerning their "objection to formal education beyond the eighth grade [which] is firmly grounded" in Amish religious beliefs).

[¶ 52] In none of these cases was the Court asked, as we are here, to find that the imposition of a neutral civil duty violates the Free Exercise Clause based solely on a generalized claim that it will interfere with a religion's doctrines or practices. For example, the Diocese contends that Fortin's claim will result in the court "assessing, and approving or disapproving, fundamental theological doctrines concerning sin, penance, forgiveness and redemption." Theological beliefs only become relevant to the First Amendment analysis, however, if the Diocese demonstrates that its ability to practice specific beliefs will be interfered with in some real and substantial way. *See Lukumi*, 508 U.S. at 565, 113 S.Ct. 2217 (Souter, J., concurring) (noting that the free exercise of religion is violated only when a law or regulation "place[s] a *substantial burden* on the observation of a central religious belief or practice") (emphasis added) (quotation marks omitted). The Diocese has not asserted that it actually holds to ecclesiastical doctrines concerning sin, penance, forgiveness and redemption that would have prevented or restricted the Bishop from intervening after learning that Melville might be sexually abusing boys, or from otherwise reporting this information to the police or the members of the parish.

[¶ 53] The Free Exercise Clause is violated only when laws actually conflict with a religion's specific doctrines and therefore "impose penalties either for engaging in religiously motivated conduct or for refusing to engage in religiously prohibited conduct." Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion,* 103 HARV. L. REV. 1409, 1412 (1990). We cannot infer from the Diocese's generalized assertions that there is, in fact, an actual doctrine or practice that will be substantially burdened by the resolution of Fortin's claim.

[¶ 54] Accordingly, whether we apply the *Smith* standard or the more rigorous standard advanced by Justice Souter in *Lukumi,* the result in this case is the same. For the reasons previously discussed, the *Smith* standard is not violated if Fortin's claim is permitted to proceed because the imposition of a duty pursuant to section 315(b) of the RESTATEMENT (SECOND) OF TORTS meets the tests of neutrality and general applicability. In addition, the more rigorous standard advanced by Justice Souter is not violated because we cannot conclude, at least at this early stage of this proceeding, that the imposition of a duty of due care will "place[ ] a substantial burden on the observation of a central religious belief or practice" of the Diocese. *Lukumi,* 508 U.S. at 565, 113 S.Ct. 2217 (Souter, J., concurring) (quotation marks omitted). On the limited record before us, there is simply no basis to conclude that any resulting burden on religious observance will be substantial.

### 2. Article I, Section 3 of the Maine Constitution

[¶ 55] The Diocese, citing *Blount v. Department of Educational & Cultural Services,* 551 A.2d 1377, 1379 (Me.1988), and *Rupert v. City of Portland,* 605 A.2d 63, 65 (Me.1992), asserts that Article I,

section 3 of the Maine Constitution is more protective of religious liberty than is the Free Exercise Clause of the First Amendment. Article I, section 3 provides:

> All individuals have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences, and no person shall be hurt, molested or restrained in that person's liberty or estate for worshiping God in the manner and season most agreeable to the dictates of that person's own conscience, nor for that person's religious professions or sentiments, provided that that person does not disturb the public peace, nor obstruct others in their religious worship;—and all persons demeaning themselves peaceably, as good members of the State, shall be equally under the protection of the laws, and no subordination nor preference of any one sect or denomination to another shall ever be established by law....

ME. CONST. art. I, § 3.

[¶ 56] Although our analysis in *Swanson* did not differentiate between the First Amendment and Article I, section 3 of the Maine Constitution, the Diocese is correct that *Blount's* and *Rupert's* formulation of the standard applied to free exercise claims is akin to the more rigorous standard advanced by Justice Souter in *Lukumi.* In order to challenge a governmental regulation of general applicability, the challenger must demonstrate:

> 1) [T]hat the activity burdened by the regulation is motivated by a sincerely held religious belief; and 2) that the challenged regulation restrains the free exercise of that religious belief. If the challenger makes those showings, the burden shifts and the State can prevail only by proving both: 3) that the challenged regulation is motivated by a compelling public interest; and 4) that no

less restrictive means can adequately achieve that compelling public interest. *Rupert*, 605 A.2d at 65–66 (quoting *Blount*, 551 A.2d at 1379) (quotation marks and citations omitted). In *Rupert* we expressly acknowledged that we were not adopting the U.S. Supreme Court's then recent holding in *Smith* as part of our Article I, section 3 analysis. *Rupert*, 605 A.2d at 65 n. 3.

[¶ 57] We did not expressly employ the *Blount* analysis in *Swanson*, but we did consider the relevant public interests and religious activities at stake, and we recognized the necessity of balancing the societal interests and the associated infringement on the free exercise of religion. *See Swanson*, 1997 ME 63, ¶¶ 12–13, 692 A.2d at 444–45. Fortin's claim is distinguishable from *Swanson* because the Diocese has not clearly identified the religious activities at stake and because the societal interest associated with Fortin's claim is substantially greater.[14] We address the four steps of the *Blount* analysis seriatim.

### a. Activity Burdened is Motivated by a Sincerely Held Religious Belief

[¶ 58] As previously discussed, the Diocese has failed to identify a specific religious activity that will be burdened, as required by the first step of the *Blount* analysis. In contrast, in *Swanson* we specifically determined that the imposition of liability for negligent supervision against the Diocese would "infringe upon [the Diocese's] right to determine the standards governing the relationship between the church, its bishop, and the parish priest." 1997 ME 63, ¶ 12, 692 A.2d at 445. This determination pertained to the specific religious undertakings of pastoral counseling by a bishop with a parish priest. *Id.* ¶ 2, 692 A.2d at 442. Pastoral counseling is a widely recognized religious practice, as indicated by the fact that the Maine Rules of Evidence establish an evidentiary privilege for confidential communications between members of the clergy and the persons who confer with them.[15] M.R. Evid. 505.

[¶ 59] The evidentiary privilege extends to confidential communications between members of the clergy if one is acting as a "spiritual adviser" to the other. M.R. Evid. 505(b). The Bishop's constitutionally protected role as a spiritual adviser to a priest accused of wrongdoing was recognized in *Swanson* when we stated that "[b]eliefs in penance, admonition and reconciliation as a sacramental response to sin

---

**14.** Unlike this case, in which our review is restricted to the pleadings, *Swanson* was decided on a report pursuant to M.R. Civ. P. 72(c) after the parties had engaged in considerable discovery. 1997 ME 63, ¶¶ 5–6, 692 A.2d at 442–43.

**15.** M.R. Evid. 505 provides the rule for religious privilege:

**(a) Definitions.** As used in this rule:

(1) A "member of the clergy" is a minister, priest, rabbi, accredited Christian Science practitioner, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting that individual.

(2) A communication is "confidential" if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.

**(b) General rule of privilege.** A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a member of the clergy acting as spiritual adviser.

**(c) Who may claim the privilege.** The privilege may be claimed by the person, by the person's guardian or conservator, or by the person's personal representative if the person is deceased. The person who was the member of the clergy at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the communicant.

M.R. Evid. 505.

may be the point of attack by a challenger who wants a court to probe the tort-law reasonableness of the church's mercy toward the offender." 1997 ME 63, ¶ 12, 692 A.2d at 445 (quotation marks and citations omitted). Consequently, we rejected the "import[ation of] agency principles wholesale into church governance and [the imposition of] liability for any deviation from the secular standard." *Id.*

[¶ 60] Thus, the free exercise issue in *Swanson* was not an abstraction. Rather, it pertained to the specific sacraments of pastoral counseling between the priest and his bishop and "constitutionally protected beliefs governing ecclesiastical relationships" between clergy members. *Id.*

[¶ 61] In contrast with *Swanson*, Fortin's claim makes no mention of facts that establish that the court will be required to delve into doctrinal matters or confidential communications in order to evaluate whether the Diocese breached a duty of due care. Fortin specifically claims that Bishop Gerry became aware of Melville's propensity to sexually abuse boys from a nonconfidential source, not in his role as a "spiritual adviser" to Melville or other priests. Viewed in a light most favorable to Fortin, his complaint does not implicate the sacrament of penance or pastoral counseling, nor does it raise the specter of "import[ing] agency principles wholesale into church governance" as in *Swanson*. 1997 ME 63, ¶ 12, 692 A.2d at 445.

b. The Challenged State Action Restrains the Free Exercise of a Religious Belief

[¶ 62] The pleadings do not establish whether, or the extent to which, the adoption of a duty of due care under the circumstances of the present case will restrain the free exercise of the Diocese's activities or beliefs, as required by the second step in *Blount*. By contrast, in *Swanson* we specifically concluded that the imposition of liability for negligent supervision against the Diocese would "infringe upon [the Diocese's] right to determine the standards governing the relationship between the church, its bishop, and the parish priest." 1997 ME 63, ¶ 12, 692 A.2d at 445.

[¶ 63] Fortin's claim is also distinguishable from *Swanson* because it is closely connected to an independent statutory duty. As the administrator of a school, the Diocese has been obligated since 1975 to report to civil authorities information that a child has been or is likely to be abused. 22 M.R.S.A. § 4011–A(1)(A)(13) (Supp.2004); P.L.1975, ch. 167, § 1 (effective Apr. 21, 1975). In 1997, subsequent to the time period during which Fortin claims to have been abused, a duty to report suspected child abuse was also imposed on "[a] clergy member acquiring the information as a result of clerical professional work except for information received during confidential communications." P.L. 1997, ch. 251, § 1 (effective Sept. 19, 1997); *see also* 22 M.R.S.A. § 4011–A(1)(A)(27).

[¶ 64] The amended complaint specifies that the Diocese became aware that Melville had a propensity to sexually abuse minor boys as the result of a letter it received. Viewed in a light most favorable to the plaintiff, Fortin's amended complaint alleges circumstances under which the Diocese, as the administrator of a school, may have had a statutory duty to report the allegations in the letter pursuant to section 4011–A(1)(A)(13). Moreover, the Diocese may have a separate duty to report today pursuant to section 4011–A(1)(A)(27). This is in marked contrast to the circumstances that would exist, for example, if the Diocese received confidential information through the confessional, pastoral counseling, or some other confidential means because of the protection

afforded confidential communications by section 4011–A(1)(A)(27).

[¶ 65] The claim considered in *Swanson* did not implicate a statutory duty similar to that associated with Fortin's claim. Rather, our conclusion in *Swanson* was premised, in part, on the absence of any existing secular duties. *See* 1997 ME 63, ¶ 12, 692 A.2d at 445 ("The imposition of secular duties and liability on the church as a 'principal' will infringe upon its right to determine the standards governing the relationship between the church, its bishop, and the parish priest."). Here, the relationship between the diocese, its priest, and the State, as it pertains to nonconfidential information regarding child abuse, is already informed by the statutory reporting requirements established in sections 4011–A(1)(A)(13) and (27).

c. Compelling Public Interest

[¶ 66] If the first two *Blount* criteria are met, the burden shifts and it must be demonstrated first that the challenged regulation is motivated by a compelling public interest. 551 A.2d at 1379. The public interest associated with Fortin's claim is far greater than the public interest considered in *Swanson*. There, the societal interest involved the maintenance of proper boundaries between the clergy and adult parishioners in the particular context of pastoral counseling. *Id.* ¶¶ 2, 13, 692 A.2d at 442, 445. The claim against the Diocese in *Swanson* did not involve acts by a priest that might also constitute criminal offenses against a child, as is the case here.

[¶ 67] In matters concerning the protection of children from physical and sexual abuse, societal interests are at their zenith. *See New York v. Ferber*, 458 U.S. 747, 756–57, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (recognizing that the state has a compelling interest in safeguarding the physical and psychological well-being of children).

The Maine Legislature has recognized "that the health and safety of children must be of paramount concern and that the right to family integrity is limited by the right of children to be protected from abuse and neglect." 22 M.R.S.A. § 4003 (2004). The Diocese acknowledges that "[i]t cannot be doubted that preventing the abuse of minors is a compelling governmental interest." The profundity of the individual and social harm resulting from the sexual abuse of children and society's interest in responding to the same requires little discussion.

[¶ 68] When viewed in a light most favorable to the plaintiff, the circumstances asserted by Fortin invoke a compelling public interest that far exceeds the interest considered in *Swanson*.

d. Least Restrictive Means

[¶ 69] The fourth step in the *Blount* analysis is to determine whether "no less restrictive means can adequately achieve [the] compelling public interest." *Blount*, 551 A.2d at 1379. This analysis cannot be made in the present case, however, because we cannot identify with any specificity the religious belief burdened by the challenged state action. Without an understanding of the religious belief or practice at stake, one cannot place in context whether the challenged state action satisfies the requirement of invoking the least restrictive means. This final criterion from the *Blount* analysis is not addressed in *Swanson*.

3. Conclusion Regarding Federal and State Constitutional Claims

[¶ 70] The Diocese asserts that "the intrinsic logic of any judicial declaration and administration of a standard of care for church oversight of clergy necessarily will involve the [c]ourt deeply in matters of theology and governance." We

do not accept this logic. It is not self-evident in this case that the application of a duty of due care will cause the Superior Court "to probe deeply ... into the allocation of power within a [hierarchical] church so as to decide ... religious law [governing church polity]" in violation of either the First Amendment or Article I, section 3 of the Maine Constitution. *Serbian E. Orthodox Diocese*, 426 U.S. at 709, 96 S.Ct. 2372 (quotation marks omitted). The Maine Constitution's guarantee of religious freedom does not create an absolute bar that prohibits any inquiry into the hierarchical relationship between the Diocese and its priests. *See Swanson*, 1997 ME 63, ¶ 8, 692 A.2d at 443. Like the First Amendment, Article I, section 3 "embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell*, 310 U.S. at 303–04, 60 S.Ct. 900.

[¶ 71] Permitting Fortin's claim to proceed, however, does not end the court's responsibility to protect the Diocese's constitutionally guaranteed right of religious freedom. The Diocese will have the opportunity later in this proceeding, by way of a motion for a summary judgment, pursuant to M.R. Civ. P. 56, a motion in limine, *see* Field & Murray, *Maine Evidence* § 103.7 at 23 (2000 ed.1999), or at trial, to demonstrate, not through intrinsic logic, but through competent evidence, that the determination of Fortin's claim will compel the court to "decide ... religious law [governing church polity]." *See Serbian E. Orthodox Diocese*, 426 U.S. at 709, 96 S.Ct. 2372.

[¶ 72] The Diocese's right to the free exercise of religion will not be infringed in the present case if "the employment decisions [it made] do not implicate religious beliefs, procedures, or law." *Drevlow v. Lutheran Church, Mo. Synod*, 991 F.2d 468, 471 (8th Cir.1993). *Drevlow* involved a tort action brought against a church by a pastor. *Id.* at 469–71. In upholding the denial of the church's assertion of First Amendment immunity, the court observed, "[a]t the present stage of this litigation we are unable to predict that the evidence offered at trial will definitely involve the [trial] court in an impermissible inquiry into the [church's] bylaws or religious beliefs.... [The plaintiff] is entitled to an opportunity to prove his secular allegations at trial." *Id.* at 471–72.

[¶ 73] The same principle applies here. Before us, the Diocese has failed to offer a concrete example of how the court's consideration of Fortin's claim will entangle it in religious doctrine. Furthermore, it is reasonably possible that Fortin's claim may be established without any substantial interference with religious doctrine.[16] Nevertheless, because our review is limited to the pleadings, it is not possible for us to anticipate at this point that the imposition of a duty will interfere with church doctrine to any meaningful degree.

[¶ 74] Accordingly, we are not persuaded that Fortin's claim that the Diocese breached a fiduciary duty should be dismissed pursuant to M.R. Civ. P. 12(b)(6) for violating the First Amendment of the United States Constitution or Article I, section 3 of the Maine Constitution.

---

**16.** Fortin might seek to prove, for example, that the Diocese, upon its receipt of nonconfidential information concerning Melville's propensity to sexually abuse boys, could have prevented the abuse by notifying Fortin's parents of the risk. Contrary to the Diocese's contentions, requiring such a notification will not likely entail judicial administration of church oversight of clergy and will not necessarily involve the court deeply in matters of theology and governance.

### F. Conclusion

[¶ 75] If a religious organization knows or has reason to know that a member of its clergy has a propensity to sexually abuse children, the First Amendment and Article I, section 3 of the Maine Constitution are not necessarily violated if the civil law imposes on the organization a duty to exercise due care to protect children with whom the organization has a fiduciary relationship, consistent with sections 315(b) and 317 of the RESTATEMENT (SECOND) OF TORTS. "The common-law test of duty is the probability or foreseeability of injury to the plaintiff. The risk reasonably to be perceived within the range of apprehension delineates the duty to be performed and the scope thereof." *Brewer*, 295 A.2d at 651.

[¶ 76] Under the facts alleged in the present case, the risk of harm posed by a priest to a child with whom the Diocese has a fiduciary relationship is "reasonably to be perceived within the range of apprehension," and creates a duty on the part of the Diocese to act. *See id.* Fortin's claim that the Diocese learned of Melville's "propensity to sexually exploit and abuse young boys," but failed to report Melville to law enforcement officials and then "conceal[ed the information] from the parishioners, [and] the public," states a claim upon which relief may be granted.

The entry is:

Judgment vacated as to Count X (Breach of Fiduciary Duty by the Roman Catholic Bishop of Portland) and remanded for further proceedings consistent with this opinion.

ALEXANDER, J., with whom CLIFFORD, J., joins, concurring and dissenting.

[¶ 77] I concur that at this preliminary, motion to dismiss stage, we must remand for development of more facts before liability and First Amendment issues can be resolved. I do not concur that we must reach out, as the Court does, and change Maine law by effectively overruling *Swanson* and, for the first time in Maine legal history, recognizing the tort of negligent supervision, something we refused to do just two years ago. From these rulings, I respectfully dissent.

[¶ 78] With these rulings, the Court invites lawsuits against businesses, schools, camps, churches, and youth sports organizations for real or perceived improprieties by their members or employees, that occur outside of the course and scope of the organizations' responsibilities. By adopting the tort of negligent supervision, the Court imposes on the Roman Catholic Church, and all other employers, a duty to not forgive, to not allow for redemption, and to give no second chances when flaws or improprieties are found in an employee's conduct, even if that conduct occurs outside the regular course of the employer's or organization's business activities.[17] We need not reach so far.

[¶ 79] Any Maine business or organization that invites minors to participate in its activities has a duty not to place minors who participate in those activities in a situation that presents a known risk of harm. Maine law is well settled that any

---

**17.** Where the negligent supervision doctrine applies, "the master may subject himself to liability under the rule [of negligent supervision] by retaining in his employment servants who, to his knowledge, are in the habit of misconducting themselves in a manner dangerous to others." RESTATEMENT (SECOND) OF TORTS § 317 cmt. c (1965). As stated in section 317, the negligent supervision doctrine only applies to employee conduct outside the scope of employment, and can create liability based on employer knowledge of employee conduct or misconduct that occurs outside the scope of employment.

business, church, or other organization is responsible for misconduct of employees or agents that occurs in the course and scope of the organization's business or activity and causes harm to others. *DiCentes v. Michaud*, 1998 ME 227, ¶ 11, 719 A.2d 509, 513. The common law of agency provides that an employer or principal is responsible for the acts of its employees or agents committed within the course and scope of employment. *Mahar v. StoneWood Transport*, 2003 ME 63, ¶¶ 13–17, 823 A.2d 540, 544–45; *Bonk v. McPherson*, 605 A.2d 74, 78 (Me.1992). In *Mahar*, we held that the Maine law of respondeat superior is consistent with the RESTATEMENT (SECOND) OF AGENCY § 228. 2003 ME 63, ¶ 13, 823 A.2d at 544. Section 228 states:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> > (a) it is of the kind he is employed to perform;
> >
> > (b) it occurs substantially within the authorized time and space limits;
> >
> > (c) it is actuated, at least in part, by a purpose to serve the master, and
> >
> > (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

RESTATEMENT (SECOND) OF AGENCY § 228 (1958).

[¶ 80] The standards stated in subsection (2) are essentially the same as the standards stated in subsection (1). Subsection (2) states what must be proven by a defendant to escape from a "within the scope of employment" determination, while subsection (1) states what must be proven by a plaintiff to bring an employee's actions within the "scope of employment" definition and thus make an employer vicariously liable for an employee's actions.

[¶ 81] Interpreting the allegations in the complaint most favorably to Fortin, as we must at this motion to dismiss stage, *In re Wage Payment Litigation*, 2000 ME 162, ¶ 3, 759 A.2d 217, 220, Fortin may be able to prove that Melville's abuse occurred (1) while Melville was performing functions for the church; (2) at church facilities when parishioners could be present for religious services or counseling; (3) during or in preparation for or closing up of activities, such as the altar boy function, that served the church's mission; and (4) with improprieties that were not unexpected due to the church's notice of Melville's prior improprieties.

[¶ 82] Fortin's claims prior to his eighteenth birthday are preserved by operation of 14 M.R.S.A. § 752–C(1) (2003).[18] The claims arising out of events alleged to have occurred prior to Fortin's eighteenth birthday are based on allegations in the complaint that someone in the church hier-

---

18. Fortin's minority is a crucial element of the cause of action, because the statute of limitations, 14 M.R.S.A. § 752–C(1) (2003), is only extended for improper sexual acts committed against Fortin while he was a minor. Fortin was born on or about December 31, 1971. He turned eighteen on or about December 31, 1989. The presently available record indicates that some time in March of 1990, the Roman Catholic Bishop of Portland received a letter indicating that Father Melville may have been engaging in sexual contact with children. That letter, and the Bishop's alleged negligent reaction to it, could only form the basis for claims against the church by Fortin as an adult. Those claims appear to be barred by the six-year statute of limitations pursuant to 14 M.R.S.A. § 752 (2003).

archy may have known of allegations of impropriety by Melville and not reacted sufficiently to them, and that Fortin then participated in common church activities where he was abused by Melville.

[¶ 83] Melville's actions, as alleged, meet all the criteria addressed by subsection (1) of RESTATEMENT (SECOND) OF AGENCY § 228. Thus, Fortin's complaint presents at least a prima facie case for respondeat superior liability. Accordingly, it would be the Diocese's burden to prove the "escape" provisions of subsection (2) of section 228. The Diocese may be able to do that with the facts more developed, but the successful proof of the escape provisions cannot be inferred at this motion to dismiss stage of the proceedings.

[¶ 84] The tort of negligent supervision does not apply to the common, regular activities of a business or organization. It only applies to employee actions outside the course and scope of their employment or agency, when it is alleged that the employer or principal may have had some notice of the employee's or agent's tendency toward impropriety. *See* RESTATEMENT (SECOND) OF TORTS § 317 (1965) (addressing the elements of a negligent supervision cause of action).

[¶ 85] Just two years ago in *Mahar*, we refused to recognize a cause of action for negligent supervision. 2003 ME 63, ¶¶ 10–11, 823 A.2d at 543. Although *Mahar* was a split opinion on application of the common law of agency, both the majority and the dissent agreed that we would not recognize the tort of negligent supervision. *Id.* ¶ 28, 823 A.2d at 547. Previously, in *Swanson v. Roman Catholic Bishop of Portland*, 1997 ME 63, 692 A.2d 441, we stated that: "[w]e have never decided that the negligent supervision of an employee constitutes an independent basis for liability on the part of an employer." *Id.* ¶ 9, 692 A.2d at 443–44. We then concluded that constitutional considerations would bar a negligent supervision claim against the church in that case. *Id.* ¶ 9, 692 A.2d at 444. We have restated our refusal to recognize the tort of negligent supervision in several cases cited by the Court.

[¶ 86] The facts in *Mahar* for recognizing that tort were particularly compelling. A truck driver, driving on his assigned route, committed acts of criminal threatening, terrorizing, and driving to endanger against occupants of a motor vehicle over a distance of fifty miles. 2003 ME 63, ¶¶ 3–5, 823 A.2d at 541–42. Subsequently, the driver was convicted for crimes arising out of this activity. *Id.* ¶ 5, 823 A.2d at 542. In *Mahar*, there was evidence that, prior to the event, the employer was on notice regarding its employee's dangerous driving tendencies. *Id.* ¶ 9 n. 2, 823 A.2d at 542. Had we recognized the tort of negligent supervision in *Mahar*, the plaintiff occupants of the motor vehicle would have had a cause of action against the trucking company. Because we declined to recognize that cause of action, the injured plaintiffs in that case were left with a cause of action against only the judgment-proof tortfeasor who had acted outside the course and scope of his employment.

[¶ 87] The negligent supervision tort is not limited to sexual abuse or violence. It extends to any perceived misconduct or impropriety. Section 317 of the RESTATEMENT (SECOND) OF TORTS, apparently adopted by the Court today, describes an employer's duty to control his or her employees in a negligent supervision cause of action as follows:

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an un-

reasonable risk of bodily harm to them, if

    (a) the servant

      (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

      (ii) is using a chattel of the master, and

    (b) the master

      (i) knows or has reason to know that he has the ability to control his servant, and

      (ii) knows or should know of the necessity and opportunity for exercising such control.

RESTATEMENT (SECOND) OF TORTS § 317 (1965).

[¶ 88] Accordingly, if it is alleged that an employer "knows or should know" of an employee's past impropriety, and it is also alleged that the impropriety manifested itself again to cause harm, that is all that must be alleged to defeat a motion to dismiss and get the case to trial.[19]

[¶ 89] Here, the recognized claim is sexual misconduct with a minor. In the next case, the asserted claim may be an allegation of after-hours assault by an employee of a business that allegedly had some notice that the employee had a short temper, or an allegation of after-hours harassment by an employee of a business that allegedly had some notice that the employee had a tendency to use foul or demeaning language. With this change in the law, the Court is taking a major step toward making organizations and businesses, big and small, responsible for any improprieties committed by employees outside of normal business activity, if those outside actions harm persons with whom the employee has had contact as a result of business or organizational activity.

[¶ 90] The message this sends to businesses, churches, and other organizations is one of zero tolerance, no forgiveness, no redemption, no second chances. When a business is aware that an employee may have, in the past, engaged in some impropriety, that business may be liable if the employee is allowed to continue to come in contact with the public and again engages in some similar impropriety. The result may be termination or refusal to hire individuals with less than perfect records in relations with the public.

[¶ 91] The Court's opinion at some points suggests that it is addressing fiduciary duty as an element of the negligent supervision claim. In *Bryan R. v. Watchtower Bible & Tract Society of New York, Inc.*, 1999 ME 144, ¶¶ 3, 15, 17, 738 A.2d 839, 842, 845, we refused to hold that a religious organization had a fiduciary duty to protect a minor from sexual abuse by an adult member of the organization who was a known child molester and who had been placed in "a position of leadership and respect" within the organization, thus gaining the minor's trust and confidence. *Id.* ¶ 5, 738 A.2d at 842. In *Bryan R.*, we stated that a fiduciary duty would be found to exist only when the law will recognize both the disparate positions of the parties and a reasonable basis for the placement of trust and confidence in the superior party in the context of specific events at issue. *Id.* ¶ 19, 738 A.2d at 846. We affirmed the grant of a motion to dismiss in *Bryan R.*, stating that we found no support for plaintiff's claim of a fiduciary relationship, "[n]or have we ever found a fiduciary relationship to exist in the circumstances presented here." *Id.* ¶ 18, 738 A.2d at 846.

---

**19.** Presumably, the plaintiffs must also allege some relationship to the employer that led to the contact with the improperly acting employee, but the elements outlined in section 317 of the Restatement do not include that limitation on potential employer liability.

[¶ 92] *Bryan R.*, which addressed improprieties occurring outside the course and scope of the church's business or activities, should remain the law. The duty properly asserted here relates to improprieties occurring within the course and scope of the church's business. That fact, that the impropriety was within the course and scope of the church's activities, is what gives rise to the duty not to place under the direction of a suspected sex abuser minors invited to the church to attend to the church's business and to serve the church's mission.

[¶ 93] Depending upon development of the facts, and resolution of the First Amendment issues upon which the Court appropriately reserves judgment, Fortin may have a remedy under well-established principles of Maine law. An employer is vicariously liable for harm caused by an employee that occurs within the course and scope of the employer's business or activity. No change in law is required to provide this remedy for harm to Fortin while he was a minor, and neutral principles of law may be applied to adjudicate the issue.

[¶ 94] By contrast it will be difficult to adjudicate a negligent supervision claim by limiting the court's inquiry to principles of secular law. The question of whether there may be fault in the bishop's supervision of a priest will require reference to canon law to determine whether, and to what extent, the bishop may have acted unreasonably, presumably by the "reasonable bishop" standard, however that may be defined. As one recent scholarly review of the law has observed:

> To determine whether a court should hold a diocese liable for negligently hiring or supervising a priest, the court will need to decide that the bishop or some other agent of the diocese possessed the authority to hire, supervise, or remove that priest, and that the diocese's agent acted carelessly in exercising that authority. Both of these determinations invite much the same inquiry as that deemed unconstitutional when applied to claims of clergy malpractice. To establish the bishop's authority over the priest, the plaintiff must introduce evidence of such authority from canon law or from the practices of the defendant or other dioceses. To establish the allegedly unreasonable exercise of the diocese's authority, the plaintiff must present evidence of what a reasonable person who possessed that authority would have done. The court will be obliged to address the question "what would a reasonable bishop have done?"

Ira C. Lupu & Robert W. Tuttle, *Sexual Misconduct and Ecclesiastical Immunity*, 2004 BYU L. REV. 1789, 1854–55.

[¶ 95] Another canon law scholar has noted that:

> The authority to impose penalties [on clerics] stems both from the Church's mission to preach the healing love of Christ as well as the need to maintain ecclesiastical order. The origins of this penal theory derive from the centrality of the forgiveness of sins in the Gospels and experience of the early Church.

John J. Coughlin, *The Clergy Sexual Abuse Crisis and The Spirit of Canon Law*, 44 B.C. L. REV. 977, 992–93 (2003) (citation omitted). Rev. Coughlin further writes:

> The principle of the salvation of souls distinguishes canon law from the secular law of the civil state. The secular order aims to establish a set of societal conditions that maximize the opportunity for material well-being and prosperity. Canon law, however, seeks to create the optimal conditions for salvation through the proclamation of conversion, forgiveness and penance.

*Id.* at 995.

[¶ 96] The inquiry into the bishop's supervision approved by the Court necessari-

ly requires inquiry into the bishop's ecclesiastical governance pursuant to canon law, and, perhaps imposition of secular standards upon church organization and administration. The Establishment Clause has been viewed as forbidding "a state from using civil law to impose a normative vision of the structure of religious organizations." Lupu & Tuttle, *Sexual Misconduct and Ecclesiastical Immunity*, 2004 BYU L. REV. at 1844. While we defer resolution of the First Amendment question to the development of the facts, the Court's adoption of a theory of liability with "supervision" as its centerpiece necessarily will require the entangled inquiry into canon and secular law and religious doctrine that the First Amendment prohibits. *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709, 713, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).

[¶ 97] I would not overrule *Swanson*, nor would I adopt the tort of negligent supervision to address improprieties that occur outside the scope of an employer's or organization's business.