STATE OF MAINE

YORK, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-05-246

KELLY DeCAMBRA, Individually and
as Personal Representative of THE ESTATE
OF LIONEL ST. HILAIRE,

Plaintiff

v.

KIMBERLY CARSON, et al.,

Defendants

ORDER

DONALD L. GARBRECHT
LAW LIBRARY

SEP 07 2007

This matter comes before the Court on Kimberly Carson's and Samantha Carson's motion for summary judgment pursuant to M.R. Civ. P. 56(c). Following hearing, the Motion is Granted.

## BACKGROUND

Plaintiff Kelly DeCambra ("DeCambra") of Biddeford, Maine is the personal representative of the estate of her son, Lionel St. Hilaire ("St. Hilaire"). Defendants Kimberly Carson and Samantha Carson ("the Carsons") reside in Hollis, Maine with Defendant Chris Carter ("Carter"), Kimberly Carson's boyfriend. Joel Fenderson, in his capacity as personal representative of the estate of his son, Zachary, is also a defendant.

Zachary Fenderson ("Fenderson") lived at the Carson home for approximately six years because he was having family problems and was romantically involved with Samantha Carson, Kimberly Carson's then 23-year-old daughter. Fenderson, who was 22 in 2004, had dated Carson since she was approximately 14 years old. The two acquired a modular home together, but continued to live at Kimberly Carson's residence because the new home did not yet have working utility services.

Fenderson had struggled with depression over the years. Eventually, he went to a physician, who recommended counseling and prescribed him medication. Fenderson apparently took the medication, but did not seek counseling. By spring 2004, Fenderson and Carson were experiencing relationship problems. In March or April of that year, Fenderson attempted suicide. After that, the Carsons gave his gun collection to his parents so that he would not have access to firearms. In the late spring of 2004, Carson and Fenderson ended their relationship. Fenderson believed that Carson had been seeing other men; she characterizes the problems as growing apart. Although Fenderson moved out of the Carson residence and began staying in the modular home with Carson's uncle, he retained access to Kimberly Carson's home.

By early July 2004, Samantha Carson had begun dating Lionel St. Hilaire. St. Hilaire was with her at her residence on July 15, when Fenderson arrived. Carson believed that Fenderson had consumed illegal drugs, including crack cocaine, but had not been drinking. Upon meeting, the two men shook hands and had a casual conversation. Following that conversation, shortly after 11:00 p.m., Samantha Carson and St. Hilaire left together to visit her cousin. Fenderson left to see Mike Carson at the modular home. The three apparently made tentative plans to meet back at the Carson residence later that night to smoke marijuana. St. Hilaire and Carson returned to her home at approximately 2:30 a.m. on July 16, as Kimberly Carson was sleeping. Fenderson was in the basement at that time. He walked upstairs to the kitchen, where Carson and St. Hilaire were sitting together. Fenderson shot St. Hilaire three times, mortally wounding him, and then killed himself.

In August 2005, DeCambra, individually and as personal representative of St. Hilaire's estate, filed this lawsuit against the Carsons, Chris Carter, and the Estate of Zachary Fenderson, alleging negligence, (statutory) wrongful death, assault, battery,

2

and loss of comfort, society, and companionship. The Carsons' answer raised several affirmative defenses, including failure to state a claim upon which relief can be granted, comparative fault, and failure to mitigate damages. The Carsons now move for summary judgment, contending that they owed no duty of care to St. Hilaire.

## DISCUSSION

### 1. Summary Judgment Standard.

Summary judgment is proper where there exist no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *see also Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653, 655. A genuine issue is raised "when sufficient evidence requires a fact-finder to choose between competing versions of the truth at trial." *Parrish v. Wright*, 2003 ME 90, ¶ 8, 828 A.2d 778, 781. A material fact is a fact that has "the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. "If material facts are disputed, the dispute must be resolved through fact-finding." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18, 22. At this stage, the facts are reviewed "in the light most favorable to the nonmoving party." *Lightfoot v. Sch. Admin. Dist. No. 35*, 2003 ME 24, ¶ 6, 816 A.2d 63, 65.

### 2. Did the Carsons Owe Plaintiff's Decedent a Duty of Care?

A party has a duty of care when he or she "is under an obligation for the benefit of a particular plaintiff." *Quadrino v. Bar Harbor Banking & Trust Co.*, 588 A.2d 303, 304 (Me. 1991). Whether a duty of care exists is a legal question. *Pelletier v. Fort Kent Golf Club*, 662 A.2d 220, 222 (Me. 1995). When there is no such duty to the plaintiff, "[a] defendant is entitled to judgment as a matter of law on a negligence claim." *Budzko v. One City Ctr. Assocs. Ltd. Partn.*, 2001 ME 37, ¶ 10, 767 A.2d 310, 313.

#### a. Foreseeability.

Here, the Carsons argue that neither of them owed St. Hilaire a duty of care

3

because they could not have foreseen that Fenderson would take St. Hilaire's life. Nevertheless, DeCambra contends that because Fenderson still had access to their home, and because St. Hilaire was an invitee, both Carsons owed St. Hilaire a duty of care to warn him of Fenderson's dangerous propensities. DeCambra alleges that the defendants were aware of Fenderson's drug use and instability but did nothing to protect St. Hilaire.

In addition, DeCambra alleges that Fenderson had made threats about harming any male companion that Samantha Carson might have, making it foreseeable that he would harm St. Hilaire. She relies on a decision in which the Law Court stated that foreseeability of harm generates a duty to act with reasonable care. *Brewer v. Roosevelt Motor Lodge*, 295 A.2d 647, 651 (Me. 1972). In *Brewer*, a motel guest who was raped sued the motel for not having adequate security measures and for failing to warn her that it was not properly secured. *Id.* at 650. Focusing on foreseeability, the Court found that the motel could not have foreseen that such a crime would occur and, therefore, did not owe the guest a duty of care to prevent it. *Id.* at 652.

The Court reached a different result in a case involving a student who was assaulted by a stranger in her dorm room. *Schultz v. Gould Academy*, 332 A.2d 368, 370 (Me. 1975). In that case, there was evidence that could have led the school's night watchman to suspect that an intruder had entered a dormitory, but the watchman did not warn students. *Id.* at 370. The Court found that because the victim was a student, she was a "business invitee"[1] and the watchman had a legal duty to take "such measures as were reasonably necessary for her safety in light of all then existing circumstances." *Id.*

---

[1] Maine law no longer distinguishes between business and social invitees. 14 M.R.S.A. § 159 (2006).

DeCambra makes a similar argument for a duty of care to St. Hilaire, an invitee. In this case, however, no duty arose by virtue of St. Hilaire's invitation into the Carson home. The Carsons knew that Fenderson had struggled with depression, had at one time been suicidal, and had exhibited frustration regarding the breakup, but such knowledge does not generate a duty to protect or warn St. Hilaire. This is especially so where St. Hilaire and Fenderson had met earlier in the evening and carried on a civil conversation, despite the fact that Fenderson may have been upset. Although he later declined an offer to smoke marijuana because he "wouldn't need it," this comment does not make it foreseeable that he was planning to end his life and St. Hilaire's. Additionally, the Carsons apparently were not even aware that Fenderson had regained access to his firearms.

Also, DeCambra makes a "latent defect" argument; in essence, she contends that, like a latent defect on a person's property for which he or she would be responsible, Fenderson's instability amounted to a latent defect of which the Carsons should have been aware, creating a duty to warn. Fenderson may have been unstable, but that would not necessarily have indicated to the Carsons that he was capable of killing another person. Based on his prior behavior, it would have been more likely that Fenderson would have committed suicide, and suicide attempts do not necessarily translate into foreseeable, violent propensities toward others.[2] As tragic as this incident was, signs of troubled behavior did not make it foreseeable, and they do not legally operate to impose a duty of care upon either of the Carsons.

b.   Special relationship.

In addition, DeCambra also asserts that a "special relationship exists" which

---

[2]   In her deposition, Samantha Carson testified that she viewed the suicide attempt as a "cry for help," not as a sign of violence toward others.

created a duty to protect or warn. However, mere knowledge "that a third party is or could be dangerous to others does not make that individual responsible for controlling the third party or protecting others from the danger." *Bryan R. v. Watchtower Bible & Tract Society of New York*, 1999 ME 144, ¶ 12, 738 A.2d 839, 844. More recently, in the context of a clergy sexual abuse case, the Court explained that "the general rule is that an actor has no duty to protect others from harm caused by third parties," unless a "special relationship exists." *Fortin v. Roman Catholic Bishop of Portland*, 2005 ME 57, ¶ 25, 871 A.2d 1208, 1217 (citations omitted). Examples of a special relationship include a contractual or a student-teacher relationship. *Id.* ¶ 25 n.5, 871 A.2d at 1217 n.5.

When considering whether a special relationship existed in this case, the Court does not consider whether the relationship between the Carsons and Fenderson was a special relationship. The Court asks whether the relationship between Samantha Carson and St. Hilaire was a special relationship that required Carson to warn him about Fenderson. The short-lived relationship between St. Hilaire and Samantha Carson is not the type of special relationship contemplated in *Fortin* or even in *Schultz*. Whether or not it would have been wise for Carson to try to protect or warn St. Hilaire on the facts presented, she was not *legally* required to warn or protect him.

## CONCLUSION

The Carsons' Motion for Summary Judgment is Granted.

Dated:      May 29 , 2007

Nicholas J. K. Mahoney, Esq. - PL
Kenneth Pierce, Esq. - DEFS. KIMBERLY
CARSON & SAMANTHA CARSON
Chris Carter - DEF. (PRO SE)

G. Arthur Brennan
Justice, Superior Court

6