Angela M. WILLIAMS et al.

v.

INVERNESS CORPORATION.

Supreme Judicial Court of Maine.

Argued April 11, 1995.
Decided Sept. 6, 1995.

Arlyn H. Weeks (orally), Conley, Haley & O'Neil, Bath, for plaintiffs.

Robert H. Steir, Jr. (orally), Bernstein, Shur, Sawyer & Nelson, Portland, for defendant.

Before ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

DANA, Justice.

Inverness Corporation appeals a judgment entered in the Superior Court (Kennebec County, *Marsano, J.*) following a jury verdict in favor of Angela M. Williams. Inverness contends that the court erred in submitting the issues of negligence, strict liability, breach of express warranty, and breach of implied warranty to the jury. Inverness also asserts that the court's special verdict form was confusing and prejudicial to Inverness, and that the court erred in not granting a mistrial after the jury submitted an incomplete special verdict form. We affirm the judgment.

I.

The evidence at the trial can be summarized as follows. Margaret Barrera owned and operated a jewelry cart at a Brunswick mall. She sold items produced by a number of manufacturers, including earrings manufactured by Inverness, a Delaware corporation headquartered in New Jersey. Barrera

also offered ear piercing using exclusively the Inverness Ear Piercing System.

According to promotional material introduced at the trial, Inverness is the "world's largest producer of ear piercing products." The Inverness system is used "by more retailers throughout the world than any other system" and it "has pierced the ears of more than 50 million people." The Inverness system includes a "compact, professional work center [that] fits easily on the counter or under it. Everything [the vendor needs] is included: piercing instrument, sterile marking pen, sealed earring cassettes, aftercare instructions for customers and Ear Care Solution for an added sale." To "round out the Inverness Ear Piercing System," Inverness provides vendors with "a training program and an eye-catching assortment of selling aids[,] [i]ncluding ... [f]ull-color counter displays, window displays and tent cards." Barrera had purchased the Inverness Ear Piercing System from a local beauty school, and she purchased sealed earring cassettes directly from Inverness. The sealed earring cassettes can only be used in conjunction with the Inverness ear piercing equipment.

Angela Williams, a seventeen-year-old high school student, had visited Barrera's stand "lots of times." She had observed the Inverness earring display, and had heard of Inverness. According to Angela, "[Inverness] was the only earring company that I knew of that pierced ears [in the cartilage area]."

In June 1991 Angela asked Barrera to pierce her left ear high in the cartilage area. Barrera produced a release form furnished by Inverness and bearing its name. The release form states at the top, in large letters, "The Only Completely Safe, Sterile Ear Piercing Method." In smaller print, the form states that "ear piercing should be limited to the earlobe area as piercing in the cartilage can result in redness, swelling and infection." Angela testified that she did not read the release form, but she did notice the Inverness name at the top. She also testified that she signed the release form *after* Barrera pierced her ear, and that Barrera did not tell her that ear piercing should be limited to the earlobe area.

Within two weeks Angela's ear swelled, became hot, and discharged green pus. She was subsequently admitted to the hospital where she received intravenous antibiotics. She was discharged after five days, but continued on intravenous therapy at home. Angela was pregnant when her ear was pierced. Her physicians told her that there was a "considerable risk" that the infection and the antibiotics would affect her fetus. Angela had an abortion in July 1991.

Angela's mother filed a complaint on behalf of Angela in May 1992. The complaint alleged negligence against Barrera, and liability for Barrera's negligence, strict liability, breach of implied warranties, and breach of express warranty against Inverness. Angela dismissed the claim against Barrera before the trial.

Angela presented eleven witnesses at the trial, including herself. After she rested, she and Inverness both moved for a judgment as a matter of law on the issue of whether Inverness is liable to Angela for negligence on the part of Barrera based on an application of the doctrine of apparent agency, and the court denied the motion. Inverness then moved for a judgment as a matter of law on the remaining claims, and the court denied this motion, as well. Inverness did not present any testimony.

The parties submitted proposed special verdict forms during the trial, and discussed these forms with the court. Inverness characterized the court's verdict form as "confusing," and raised the possibility that the jury "might think that [it's] supposed to skip the other questions between 1 and 8." Although the court explained the form to the jury as part of its charge, the jury, in fact, answered only questions 1 and 8. Without discussing the matter with counsel, the court instructed the jury to return to its deliberations until it could return "a verdict which includes an analysis of the entire form." Inverness then moved for a mistrial based on "the deficiency in the verdict form." The court denied that motion. The jury deliberated for a short period, and answered all six remaining questions on the verdict form.

The completed verdict form set forth a verdict for Angela on every claim and an

award of $90,000. A judgment was entered accordingly, and this appeal followed.

## II.

■ When reviewing a trial court's denial of a motion for a judgment as a matter of law, we must determine whether by any reasonable view of the evidence, including the inferences to be drawn therefrom, taken in the light most favorable to the non-moving party, the verdict can be sustained. *Ames v. Dipietro–Kay Corp.*, 617 A.2d 559, 561 (Me. 1992); M.R.Civ.P. 50. The judgment in favor of the non-moving party must stand unless it is clearly erroneous. *Ames*, 617 A.2d at 561.

Angela's negligence claim against Inverness rests on an application of the doctrine of apparent agency. In *Libby v. Concord Gen. Mut. Ins. Co.*, 452 A.2d 979, 982 (Me.1982), we stated:

> "[A]pparent" authority is "that which, though not actually granted, the principal knowingly permits the agent to exercise or which he holds him out as possessing." Apparent authority exists only when the "*conduct of the principal* leads a third person to believe that a given party is his agent."

*Id.* (citations omitted) (emphasis in original). *See also Twin Island Dev. Corp. v. Winchester*, 512 A.2d 319, 324 (Me.1986) ("Apparent authority can arise if the principal knowingly or negligently holds someone out as possessing authority to act for him or her, even though no actual authority has been given....."). We note that the *Restatement (Second) of the Law of Agency* § 267 (1958) provides,

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care and skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

*Id.* See also W. Prosser, Keeton, et al., *Prosser and Keeton on the Law of Torts*, § 70 at 508 (5th ed. 1984) (explaining that the principal is liable for torts committed by an agent in "cases in which a tort may be based upon the apparent authority of the agent to act for his principal").

We have noted that negligence does not exist in the abstract. *Trusiani v. Cumberland and York Distribs., Inc.*, 538 A.2d 258, 261 (Me.1988). Whether one party owes a duty of care to another is a question of law. *Morrill v. Morrill*, 616 A.2d 1272, 1274 (Me. 1992). Duty involves the question of whether a defendant is under any obligation for the benefit of the particular plaintiff. *Trusiani*, 538 A.2d at 261. We have observed that many factors can influence the duty determination, including "the hand of history, our ideals of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall." *Id.* (quoting William L. Prosser, *Palsgraf Revisited*, 52 Mich.L.Rev. 1, 15 (1953)). We have explained that duty often also turns "on recognizing and weighing relevant policy implications." *Cameron v. Pepin*, 610 A.2d 279, 282 (Me.1992). When we find a duty in a negligence case "the duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk." *Trusiani*, 538 A.2d at 261.

The transaction in this case is a hybrid partaking of incidents of a sale and a service. Barrera was not simply a retailer; she also provided the service of piercing ears using exclusively the Inverness Ear Piercing System. Barrera had a duty to conform to the standard of care required of an ordinary careful provider of ear piercing services. It would be a question for the jury whether Barrera breached this standard by piercing Angela's ear in the cartilage area and/or in failing to adequately warn Angela of the risks involved in the procedure.[1]

■ The key issue here is whether it is a question for the jury whether Inverness either intentionally or negligently held Barrera out as its agent with respect to the ear

---

1. Inverness acknowledges that the ear piercing kits provide instructions and warnings not to pierce ear cartilage, and that the release forms expressly recognize that piercing in the cartilage can result in "redness, swelling and infection."

piercing, and whether Inverness therefore could be held liable for Barrera's negligence. There are critical pieces of evidence in the record that can fairly be interpreted as leading to an inference that Inverness did hold Barrera out as its agent. Most important, a jury reasonably could infer that Inverness knew, or should have known, that Barrera distributed Inverness's release forms and after-care instructions. Indeed, a jury reasonably could infer that Inverness held Barrera out as its agent for the express purpose of securing releases from its end-users. A jury reasonably could infer, as well, that Inverness was aware that its vendors were piercing in the cartilage area and it, in fact, condoned the practice.[2]

Inverness sold 36 sealed earring cassettes directly to Barrera. The sealed earring cassettes can only be used in conjunction with the Inverness ear piercing equipment. Inverness's assertion that "there is no evidence in the record that Inverness even knew that Barrera was using its earlobe piercing device before June 15, 1991," is arguably belied by the fact that she ordered the sealed earring cassettes in March 1991. A jury reasonably could infer, therefore, that Inverness knew, or should have known, that Barrera was using the Inverness Ear Piercing System, that she displayed Inverness's "eye-catching assortment of selling aids," and that she used Inverness's training program.

Finally, there was evidence that Angela believed that Barrera was Inverness's agent, that Angela relied on Inverness's manifestations of agency, and that Angela's reliance on Barrera's care and skill was justifiable. Angela testified, "[Inverness] was the only earring company that I knew of that pierced ears [in the cartilage area]." The release

form and display promote the Inverness Ear Piercing System as "The Only Completely Safe, Sterile Ear Piercing Method." Given the evidence in the circumstances of this case, the court did not err in letting the jury decide whether Inverness either intentionally or negligently held Barrera out as its agent with respect to the ear piercing, and whether Inverness therefore could be held liable for Barrera's negligence based on an application of the doctrine of apparent agency.

Because we find that the court did not err in submitting the issues of negligence and apparent agency to the jury, it is not necessary to discuss whether the court erred in submitting to the jury the additional claims based on strict liability, breach of express warranty, and breach of implied warranty. It is necessary, however, to address the issue of the jury verdict form.

■ M.R.Civ.P. 49 gives the trial court broad discretion in framing the interrogatories submitted to a jury in a special verdict form. *Cole v. A.J. Cole & Sons, Inc.,* 567 A.2d 1342, 1343 (Me.1989). The rule does provide, however, that "[t]he court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue." *Id.* (quoting M.R.Civ.P. 49).

The verdict form was poorly drafted, but the record does not necessarily suggest that the jury misunderstood it or the court's instructions. The form was given to the jury before the closing arguments, and both the attorneys spoke to the jury with respect to the form and the court explained the form to the jury as part of its instructions. Additionally, there is no evidence to support a claim of jury misconduct.[3]

2. At the trial, Carol Hillman, Inverness's customer service manager, acknowledged that "our customers were asking to do cartilage piercing." Subsequent to Hillman's acknowledgement, the following exchange took place:
Q. Okay. So in 1991 ... you didn't recommend [piercing in the cartilage area] but you certainly allowed your vendors out there in the field such as Ms. Barrera to do all the cartilage piercing that they wanted to do?
A. We didn't discuss it.
Q. That's the point. You didn't discuss it at all, did you?

A. No.

3. "A claim of jury misconduct must be based on a showing of bias, passion, or prejudice that affected the deliberations." *Cuthbertson v. Clark Equip. Co.,* 448 A.2d 315, 318 (Me.1982). We stated in *Cuthbertson,* "Absent clear evidence of improper conduct by jurors, the Superior Court did not abuse its discretion in refusing to set aside a verdict which was supported by the evidence." *Id.*

■ We review the trial court's denial of a defendant's motion for a mistrial for an abuse of discretion and will only overrule its decision when the record discloses exceptionally prejudicial circumstances. *See State v. Bedrin*, 634 A.2d 1290, 1292 (Me.1993). We find that the court acted within its discretion in denying Inverness's motion for a mistrial.[4]

The entry is:

Judgment affirmed.

RUDMAN, Justice, with whom CLIFFORD, Justice, joins, dissenting.

I respectfully dissent. The court has based its decision on Margaret Barrera's apparent authority to bind Inverness. As the court notes:

> "[A]pparent" authority is "that which, though not actually granted, the principal knowingly permits the agent to exercise or which he holds him out as possessing." Apparent authority exists only when the *"conduct of the principal* leads a third person to believe that a given party is his agent."

*Libby v. Concord Gen. Mut. Ins. Co.*, 452 A.2d 979, 982 (Me.1982) (citations omitted). The *Restatement (Second) of the Law of Agency* defines apparent authority as "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." *Restatement (Second) of the Law of Agency* § 8 (1958). Such authority "is created as to a third person by written or spoken words or any other conduct *of the principal* which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Id.* § 27. Apparent authority can, therefore, be created only by the principal's manifestation to a third party. "Until there has been a communication [from the principal] to a particular person, and until that person learns facts from which he reasonably infers that the agent is authorized, there is no apparent authority...." *Id.* cmt. b. "The agent's representations of authority to a third person, standing alone, are insufficient to create apparent authority in the agent to act for the principal." *Moreau v. James River–Otis, Inc.* 767 F.2d 6, 10 (1st Cir.1985). "Apparent authority exists only to the extent that is *reasonable* for the third person dealing with the agent to believe that the agent is authorized." *Restatement (Second) of the Law of Agency*, § 8 cmt. c. (emphasis added).

Angela did not see nor was she provided the promotional material to which the court refers prior to her engaging Barrera to pierce the cartilage of her ears. Williams testified that Barrera's kiosk bore the sign "Inverness" indicating that earrings made by Inverness were sold at the kiosk and offered testimony that the release, she saw and signed *after* her ears were pierced, bore the word "Inverness." To establish apparent authority Williams had the burden to offer proof that Inverness *by its conduct* would cause a reasonable person to believe that Barrera was acting on Inverness's behalf. On the meager evidence offered by Williams one could neither actually nor reasonably believe that the purported agent (Ms. Barrera) had authority to act on behalf of the principal (Inverness). The court erred in submitting the issue of apparent authority to the jury.

The trial court further erred by directing the jury to consider Williams's additional claims based on strict liability, breach of expressed warranty, and breach of implied warranty.

"Strict products liability attaches to a manufacturer when by a defect in design or manufacture, or by the failure to provide adequate warnings about its hazards, a product is sold in a condition unreasonably dangerous to the user." *Pottle v. Up–Right,*

---

4. After the jury reported with an incomplete special verdict form, it would have been a better practice for the court to inform counsel for the parties and to apprise them that the court intended to instruct the jury to return to its deliberations until it could return a verdict that included an analysis of the entire form. The jury did, however, subsequently complete the verdict form, its verdict is supported by the evidence, and the court's explanations and instructions were adequate.

*Inc.*, 628 A.2d 672, 674–75 (Me.1993). Williams alleges a failure to warn. Such a duty arises when the manufacturer knew or should have known of a danger sufficiently serious to require a warning. *Id.* When such duty to warn exists, the warning must advise the user of the risks associated with its product and offer the user specific directions of the products safe use. *Id.* The manufacturer's failure to provide an adequate warning must be a substantial factor in bringing about the plaintiff's injury. *Id.* Williams offered no testimony that she saw the warnings provided to Barrera or that the warnings were inadequate.

To prove a case based on breach of an expressed warranty one must offer evidence of an express warranty. To the extent there is to be an express warranty it is found in the release, which release Williams failed to read. A claim based on a breach of the implied warranty of merchantability must be based on evidence that the device was used in the manner for which it was intended. Williams offered no evidence that Inverness's product was not "fit for the ordinary purposes" for which it was purchased. *Lorfano v. Dura Stone Steps, Inc.*, 569 A.2d 195, 197 (Me.1990). The record is devoid of evidence that the Inverness product was defective if used, as it was intended to be used, to pierce ear lobes. I would vacate the judgment entered by the trial court and remand for entry of a judgment in favor of Inverness.