STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-08-342
RAC - Cum - 1/15/2010

KATIE GNIADEK,

Plaintiff

ORDER

v.

CAMP SUNSHINE AT SEBAGO
LAKE, INC., et al.,

Defendants

Plaintiff Katie Gniadek brought this action against Camp Sunshine at

Sebago Lake, Inc., and codefendant Michael Newton, a former volunteer camp

counselor, after Newton sexually assaulted Gniadek on November 25-26, 2005.

Gniadek's amended complaint alleges that Camp Sunshine was generally

negligent; negligently hired, supervised, and retained Newton; is vicariously

liable for Newton's actions; and breached its fiduciary duty to Gniadek.

Defendant Camp Sunshine has filed this motion for summary judgment. The

Court grants Camp Sunshine's motion on all counts.

## BACKGROUND

Defendant Camp Sunshine at Sebago Lake, Inc., is a non-profit

corporation that provides traditional summer camp experiences to children with

chronic or life-threatening diseases and to their families. The Camp does not

charge any fees for its programs and provides free boarding and meals to

1

attendees. To attend, children must be in their usual state of health and be accompanied by a parent or guardian, who they lodge with. "Camp medicine" amounting to first aid is provided for all attendees and volunteers, but children remain under the general care of their parent or guardian. While part of the Camp's program involves support groups, the Camp does not provide substance abuse treatment or psychiatric or psychological therapy.

In 2005 codefendant Michael Newton, then age 58, worked as a volunteer at Camp Sunshine. He alternately served as a counselor, teen counselor, and food service worker between July and November of that year. Camp Sunshine required that Newton fill out an employment application and provide two references before it would accept him as a volunteer. The Camp checked the references, but did not conduct a background check or personally interview Newton at that time. His volunteer service ended on November 18, 2005, after which time he was required to reapply for the 2006 season. The record shows that he had submitted an application for 2006, but that he was never offered a position.

Loren Christopher was another volunteer counselor at Camp Sunshine in 2005. Loren, a female, was 18 years old in August 2005. On August 26, 2005, Loren told campus director Michael Katz that Newton was making her uncomfortable. On a trip to Walmart with other volunteers, Newton had purchased a small card and gift for Loren and then asked her out for lunch or ice cream. On another occasion, Newton brought food to Loren's room when she was not feeling well. Newton was also in the habit of telling volunteers about his personal life, and he had made attempts to hug Loren or make other non-sexual

physical contact. Loren told Katz that these incidents, together with other attention Newton had paid her, made her uncomfortable in his presence.

Katz responded by telling Loren that he would speak with Newton and that in the meantime she should try to avoid him. The next day, August 27, 2005, Katz brought Newton to his office to discuss Newton's behavior. When confronted, Newton admitted to his actions and claimed that he was just trying to be friendly. Katz advised Newton to give people more personal space and ended the meeting.

After the meeting Katz ordered a criminal background check and driver's history check on Newton. Both checks came back clean. Katz spoke with one other volunteer about Newton and asked her if she had seen anything unusual. That volunteer indicated that she had not, and Katz did not make further inquiries. Around this time another volunteer claims to have seen Newton "pat the rear ends or rub the shoulders of several young females, including younger kids," but that volunteer did not report this to the Camp's officials.

Katie Gniadek and her mother, Kimberly Cooper-Morin, attended Camp Sunshine during the week of September 3–9, 2005. Gniadek had attended Camp Sunshine previously and participated in fundraising events, but the dates and extent of this involvement subject to dispute.[1] There is no dispute, however, that Gniadek and Cooper-Morin became acquainted with Newton in his role as a volunteer counselor while at Camp in 2005. On the last day of the session, Newton gave Gniadek a card and a gift, and asked her if they could stay in touch. She agreed, and Newton gave her his contact information. Gniadek was 17 years old at this time.

---

[1] This dispute is not material to the Court's decision.

At each session, Camp Sunshine compiles a list of the attending parents' and guardians' contact information. The Camp began this practice at the campers' families' request. This list is made available at the registration desk as a resource so attendees can maintain communication with each other after leaving the Camp if they choose. An attendee's name and information only appear on the list with the attendee's knowledge and consent. Cooper-Morin's name and contact information was on the list for the session she attended with Gniadek.

Newton finished volunteering at Camp Sunshine on November 18, 2005. He contacted Cooper-Morin five days later on November 23, 2005. Newton told Cooper-Morin that he was going to New York to visit Ana Collado and her family, and that he was inviting Gniadek, Cooper-Morin's daughter, to go with him. Collado and her family were former attendees of Camp Sunshine. Cooper-Morin gave Newton her daughter's cell phone number, and Newton proceeded to call Gniadek and tell her about the trip. These calls were the first contact either Cooper-Morin or Gniadek had with Newton since their session at Camp Sunshine ended on September 9, 2005.

Newton told Gniadek that he was done with Camp Sunshine, that he had already visited Anna Collado's son in New York once, and that he was going back to visit Collado and other former camp attendees and volunteers. Gniadek indicated that she wanted to accompany Newton to New York, but needed her mother's permission. Two days later on November 25, 2005, Newton called Gniadek and told her that he was going to New York that day. Gniadek obtained her mother's permission and left her home with Newton around 6:00 pm. Both Gniadek and her mother knew that the trip was a personal, private visit to New

4

York independent of Camp Sunshine. Camp Sunshine had no knowledge of these events.

Neither Cooper-Morin nor Gniadek contacted any of the people Gniadek thought she was going to visit before Gniadek left with Newton. In fact, Newton and Gniadek were not expected in New York. As they were driving, Newton asked Gniadek about her medications and whether any of them made her sleepy. She indicated that one would make it very hard for her wake up. Gniadek believes that her mother may have told Newton about the medications before they left Maine.

Between 9:00 and 10:00 pm Newton stopped the car at a gas station in Connecticut and reminded Gniadek to take her medicine. Shortly thereafter he told Gniadek that he was too tired to continue driving and that they would have to spend the night at a hotel. Newton drove to a Super 8 Motel and booked a room with one bed, telling Gniadek that there were no other options available. Gniadek, feeling very tired and under the influence of her medications, went to sleep in that bed. She woke up to find Newton on top of her with his fingers in her vagina. She freed herself, left the room, and called for help. Newton was arrested and subsequently pleaded guilty to sexual assault.

Camp Sunshine has a $1,000,000 insurance policy that potentially covers Gniadek's claims. Gniadek filed her initial complaint on June 12, 2008, amended August 11, 2009, against both Newton and Camp Sunshine. Newton has not filed a responsive pleading, but Gniadek has declined to prosecute her case against him. Instead, she has directed her attention to Camp Sunshine. Gniadek's amended complaint alleges that Camp Sunshine was generally negligent in its operations and specifically was negligent in its hiring, supervision, and retention

of Newton. She also claims that Camp Sunshine breached a fiduciary duty, and that the Camp is vicariously liable for Newton's assault. Camp Sunshine filed this motion for summary judgment on September 23, 2009.

## DISCUSSION

Gniadek's essential theory is that Camp Sunshine's pre-hire screening processes, training procedures, and program fell below the standard of care required of a children's camp. She argues that if the Camp had followed appropriate procedures, Newton would have been identified as a predator and would not have been accepted as a volunteer or would have been fired after the incident with Loren Christopher. In a similar vein, Gniadek argues that the Camp created a dangerous situation by making a list of the campers' guardians' contact information available, because it was foreseeable that a sexual predator would attempt to use that information. To support these propositions, Gniadek has provided the opinions of child-abuse prevention expert Dr. David Jewell in twenty-eight "statements of material fact." Finally, Gniadek claims that she had a special relationship with the Camp creating a heightened duty of care in her case.

Camp Sunshine defends itself by arguing that it had neither the ability nor the duty to protect Gniadek from Newton at the time the assault took place. Neither of them had any legal relationship to the Camp on November 25–26, 2005, and the Camp had no knowledge of the planned trip. On the facts, Camp Sunshine posits that Gniadek has failed to make her prima facie claims on all counts.

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

M.R. Civ. P. 56(c); *see also Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653, 655. A motion for summary judgment must be supported by citations to record evidence of a quality that would be admissible at trial. *Id.* at ¶ 6, 770 A.2d at 656 (citing M.R. Civ. P. 56(e)). An issue of "fact exists when there is sufficient evidence to require a fact-finder to choose between competing versions of the truth at trial." *Inkell v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745, 747 (quoting *Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶ 2, 845 A.2d 1178, 1179). Any ambiguities "must be resolved in favor of the non-moving party." *Beaulieu v. The Aube Corp.*, 2002 ME 79, ¶ 2, 796 A.2d 683, 685 (citing *Green v. Cessna Aircraft Co.*, 673 A.2d 216, 218 (Me. 1996)).

## 1. Negligent Hiring

In *Dexter v. Town of Norway* the Law Court recognized the tort of negligence in selecting a contractor. 1998 ME 195, ¶ 10, 715 A.2d 169, 172 (adopting Restatement (Second) of Torts § 411 (1965)). While *Dexter* involved the selection of an independent contractor, the same principles should apply to the selection of an employee. *Brennan v. Stone Coast Brewing*, 2003 Me. Super. LEXIS 12, * 4 (Jan. 21, 2003). An employer will be liable for harm to third parties caused by the employer's failure to exercise reasonable care to employ a competent and careful employee. *See* Restatement (Second) of Torts § 411.

Camp Sunshine knows there is a risk that sexual predators will attempt to work in positions that bring them into contact with children and young adults. Gniadek argues that before accepting anyone as an employee or volunteer, a camp such as Camp Sunshine must at minimum check the person's references, perform a criminal background check, and conduct a personal interview. Because Camp Sunshine did not conduct a background check or personally

7

interview Newton before accepting him as a volunteer, Gniadek contends that the Camp is liable for his subsequent assault.

This theory of liability is flawed. While the Camp admittedly did not conduct a background check or interview Newton before accepting him as a volunteer, the Camp did obtain positive references. When the Camp did conduct a criminal background check after Loren Christopher expressed her discomfort, the check did not reveal any indication that Newton might be a predator. His criminal history was clean. At that point Camp officials had spoken with Newton and believed they had developed an understanding of his motives. Together, the record does not reveal any objective information in Michael Newton's history to indicate that he would pose a danger to campers.[2]

If Camp Sunshine's screening procedures were inadequate, that inadequacy did not result in the acceptance of an individual who would otherwise have been disqualified. Gniadek has not shown that the pre-volunteer screening she advocates would have prevented Michael Newton from being a counselor at Camp Sunshine. Absent any such showing, Gniadek's claim for negligent hiring must fail.

## 2.    Negligence

Gniadek contends that Camp Sunshine negligently failed to realize that Newton posed a threat to the campers and allowed him to continue

---

[2] Gniadek refers to a case from the District of South Dakota for the proposition that Newton's lack of experience in working with children should have flagged him as a potential danger. In that case, *Brown v. Youth Services*, the court emphasized that the defendant academy had affirmatively listed inexperience with children as a flag for additional pre-employment inquiry, and had failed to investigate a negative reference. 89 F.Supp.2d 1095, 1103 (D.S.D. 2000). Here Camp Sunshine does not have such a policy, and Newton's references were positive. Furthermore and as discussed above, there is no evidence that additional inquiry would have yielded information disqualifying Newton from serving as a volunteer.

volunteering, with the foreseeable result being that he sexually assaulted a former camper on an independent trip to New York. This claim primarily arises from the incident involving Newton and Loren Christopher. Gniadek posits that Newton's behavior toward Loren and his physical contact with other female campers formed a body of evidence from which Camp Sunshine knew or should have know that Newton was a predator. Gniadek argues that if the Camp had adequately investigated Newton after Loren's complaint and had properly trained its volunteers, then the Camp would have terminated Newton's volunteer employment. This in turn would have prevented him from meeting Gniadek, prevented him from subsequently contacting her after leaving the Camp, and prevented him from assaulting her.

Camp Sunshine counters by arguing that it had no duty to Gniadek at the time she was assaulted, and that it cannot be liable for Newton's actions. The Camp agrees that it had a duty to keep Gniadek safe while she was attending her session in September, and contends that it satisfied that duty by preventing any harm to Gniadek during her week at camp. When Gniadek left Camp Sunshine uninjured and returned to the sole care a custody of her mother, the Camp argues that it was discharged from its duty to protect her.

Whether one party owes a duty to another is a question of law. *Williams v. Inverness Corp.*, 664 A.2d 1244, 1246 (Me. 1995) (citing *Morrill v. Morrill*, 616 A.2d 1272, 1274 (Me. 1992)). The scope of a duty is premised on many factors including the foreseeable harms, social policy, "the hand of history, our ideals of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall." *Cameron v. Pepin*, 610 A.2d 279, 281 (Me.

1992) (quoting *Trusiani v. Cumberland & York Distributors, Inc.*, 538 A.2d 258, 261 (Me. 1988)).

In this case the Court will assume that Camp Sunshine had a duty to protect camp attendees on its premises from potential predators. The question becomes whether Camp Sunshine's duty to protect campers in its custody included a duty to prevent campers from coming into contact with individuals who might foreseeably in the future attempt to harm them while away from Camp. Gniadek contends that the Camp did have this duty, or alternately created such a duty by making the parents' and guardians' contact information available to attendees and volunteers.

The difficulty with Gniadek's argument is that it performs an end-run around the newly recognized tort of negligent supervision. In *Fortin v. Roman Catholic Bishop of Portland*, the Law Court recognized the tort of negligent supervision for the first time. 2005 ME 57, ¶¶ 19, 39, 871 A.2d 1208, 1215–16, 1222 (adopting Restatement (Second) of Torts §§ 315(b), 317 (1965)). A plaintiff may hold an employer liable for harm caused by an employee outside the scope of employment if the plaintiff has a "special relationship" with the employer, the employee is on the employer's premises or is using the employer's property, and the employer knows or should know that it can control the employee and "knows or should know of the necessity and opportunity for exercising such control." *Fortin*, 2005 ME 57, ¶ 39, 871 A.2d at 1222; Restatement (Second) of Torts § 317. In recognizing the tort of negligent supervision, the Court acknowledged that it was an exception to the general rule "that an actor has no duty to protect others from harm caused by third parties." *Fortin*, 2005 ME 57,

10

¶ 25, 871 A.2d at 1217 (citing *Bryan R. v. Watchtower Bible & Tract Society of New York, Inc.*, 1999 ME 144, ¶ 12, 738 A.2d 839, 844).

The theory of Gniadek's negligence claim is that Camp Sunshine improperly allowed Newton to remain as a volunteer, allowing him to form a relationship and gather information that he later used outside the scope of his volunteer duties to cause harm. In other words, Camp Sunshine should have known that it needed to control or remove Newton for the protection of third-party attendees but failed to do so. At its essence this is a claim for negligent supervision. Gniadek would use the concept of proximate causation to perform an end-run around the specific requirements of the negligent supervision claim and substitute it with ordinary negligence. This Court will not stretch the chain of proximate causation so far.

When Camp Sunshine is in session, it is presumably able to exercise some degree of control over its volunteers and attendees. Assuming that the Camp has a duty to exercise that control for the attendees safety, both the control and the duty end when campers return home to the custody of their parents and guardians. At this point the Camp's relationship with its former attendees is governed by the general rule and the Camp does not have a duty to protect former campers from harm caused by third parties. *See id.* In this case, if the Camp was negligent in retaining Newton after the Loren incident it was because Newton posed a risk to the other volunteers and attendees during the summer sessions. Gniadek was not harmed while at Camp Sunshine, nor were any other campers harmed. This undisputed fact establishes that the Camp met its duty of care.

### 3. Negligent Supervision

As stated above, an employer may be held liable for the intentional torts of its employee if (1) the plaintiff has a "special relationship" with the employer, (2) the employee is on the employer's premises or is using the employer's property, and (3) the employer both knows or should know that it can control the employee and "knows or should know of the necessity and opportunity for exercising such control." *Fortin*, 2005 ME 57, ¶ 39, 871 A.2d at 1222; Restatement (Second) of Torts § 317.

Gniadek claims that her attendance at Camp Sunshine, her personal relationships with other campers and some camp volunteers and employees, and her occasional fundraising activities create a special relationship between her and Camp Sunshine. She further claims that the list of contact information with her mother's phone number on it was Camp Sunshine property that Newton, as an employee, used to assault her. Finally, she claims that the Camp knew or should have known that Newton was a threat it could control, but failed to do so. Consequently, Gniadek would hold Camp Sunshine liable for Newton's assault. Camp Sunshine disputes all of the above.

In relation to a claim for negligent supervision, the phrase "special relationship" is something of a term of art. Only the four relationships enumerated in Restatement (Second) of Torts § 315(b), or "those fiduciary relationships in which there exists a 'great disparity of position and influence between the parties'" qualify. *Dragomir v. Spring Harbor Hospital*, 2009 ME 51, ¶¶ 18–19, 970 A.2d 310, 315–316 (quoting *Fortin*, 2005 ME 57, ¶¶ 34, 37, 871 A.2d at 1220, 1222). Whether such a fiduciary duty exists is a question of law. *Fortin*, 2005 ME 57, ¶ 35, 871 A.2d at 1221.

Gniadek does not claim to have one of the enumerated relationships with Camp Sunshine, but rather to have a special fiduciary relationship. When discussing this issue, the Law Court has "noted that '[a] fiduciary duty will be found to exist . . . only in circumstances where the law will recognize both the disparate positions of the parties and a reasonable basis for the placement of trust and confidence in the superior party in the context of specific events at issue.'" *Fortin*, 2005 ME 57, ¶ 26, 871 A.2d at 1218 (quoting *Bryan R.*, 1999 ME 144, ¶ 20, 738 A.2d at 846) (alternations in original) (emphasis added). Mere "kinship, friendship, business relationships, or organizational relationships" will not suffice. *Bryan R.*, 1999 ME 144, ¶ 20, 738 A.2d at 846.

Only two reported cases in Maine specifically address the existence of special fiduciary duties in relation to negligent supervision. In *Fortin*, the Court found a special fiduciary relationship existed between the child plaintiff and the defendant diocese. There the plaintiff "was both a parochial school student and an altar boy," whose parents the diocese knew to be ill. *Fortin*, 2005 ME 57, ¶ 31, 871 A.2d at 1219. These roles brought the child under "the supervision, control, and authority of the diocese on a daily basis." *Id.* at ¶ 34, 871 A.2d at 1220. This relationship "at its very core . . . [was] marked by the 'great disparity of position and influence between the parties' that is a hallmark of a fiduciary relationship." *Id.* (citing *Morris v. Resolution Trust Corp.*, 622 A.2d 708, 712 (Me. 1993)).

In *Dragomir v. Spring Harbor Hospital* the Court found that a special fiduciary relationship could have existed between the plaintiff patient and defendant hospital. The adult plaintiff had been admitted to the hospital to be treated for "mental illness and drug and alcohol abuse." *Dragomir*, 2009 ME 51, ¶ 2, 970 A.2d 310, 312. Treatment involved intensive inpatient counseling with a

13

therapist, followed by weekly counseling sessions with that same therapist. *Id.* at ¶¶ 2–3. During the course of treatement, a sexual relationship developed between the plaintiff and his therapist. *Id.* The therapist supplied the patient with drugs and alcohol throughout their relationship. *Id.* at ¶ 3.

When the Law Court addressed whether the plaintiff had a special fiduciary relationship with the hospital that employed the therapist, it focused on the plaintiff's intense dependence on the hospital. The Court found that a patient who first required hospitalization, and later intensive outpatient treatment for his severe mental illness, created a relationship "marked by a 'great disparity of position and influence between the parties.'" *Id.* at ¶ 21, 970 A.2d at 316 (quoting *Fortin*, 2005 ME 57, ¶ 34, 871 A.2d at 1220). If the plaintiff was able to prove the alleged facts, the Court held that they would create a special fiduciary relationship from which the hospital could be held liable for negligent supervision of its employee.

Here, Gniadek claims that she had a special fiduciary relationship with Camp Sunshine based on her multiple attendances at Camp, her alleged fundraising activities on the Camp's behalf, and her personal relationships with some Camp employees and volunteers. Even assuming that all of Gniadek's alleged facts about her involvement with the Camp are true, they do not establish the existence of a special fiduciary relationship. Gniadek's allegations show that her relationship with Camp Sunshine, while cherished, was occasional and casual throughout the year. She maintained her friendships and participated in irregular fundraising activities. This stands in marked contrast to the relationships in *Fortin* and *Dragomir*, where the plaintiffs were obligated to be under the control of their institutions on a daily or weekly basis.

14

Perhaps more significantly, Gniadek has not alleged any fact that would indicate that Camp Sunshine had particular influence or authority over her. Apart from a weeklong session at Camp, Gniadek was not obligated to spend every one of her days under the Camp's authority, like the plaintiff in *Fortin* was. She did not dependent on the Camp for medical treatment, like the plaintiff in *Dragomir* did. The only source of influence Gniadek can claim the Camp held is Gniadek's own goodwill. The relationship Gniadek describes simply is not one "marked by a 'great disparity of position and influence between the parties.'" *Id.* at ¶ 21, 970 A.2d at 316 (quoting *Fortin*, 2005 ME 57, ¶ 34, 871 A.2d at 1220). Gniadek did not have a special fiduciary relationship with Camp Sunshine and her claim for negligent supervision fails on this basis.

Assuming in the alternative that there was a special fiduciary relationship between Gniadek and the Camp, her claim still fails because the record shows that Camp Sunshine did not have control over Newton when he assaulted her. Newton's service with Camp Sunshine ended on November 18, 2005, five days before he first contacted Gniadek about the trip to New York. To continue any relationship with the Camp, Newton had to reapply and be accepted for the 2006 season. When Newton assaulted Gniadek on November 25–26, 2005, the only control the Camp could have exercised was to threaten not to accept him as a volunteer. Holding that an employer can control its employee by threatening not to hire him is an contradiction in terms and cannot satisfy the control element set forth in Restatement (Second) of Torts § 317.

15

## 4. Breach of Fiduciary Duty

As discussed above, Camp Sunshine did not owe Gniadek a fiduciary duty. Whatever duty the Camp owed to Gniadek while she attended a session was discharged when she left Camp Sunshine's campus unharmed.

## 5. Vicarious Liability

When Newton sexually assaulted Gniadek, he was not employed by Camp Sunshine or otherwise under the Camp's control. Both Gniadek and her mother knew that he had finished his working relationship with the Camp, and that the planned trip to New York was personal in nature. Given that Newton was not employed by the Camp, and given that Gniadek knew that he was not acting on the Camp's behalf, the Camp cannot be held vicariously liable or liable under agency theory for Newton's act. Finally, sexual assault is far removed from the scope of volunteer duties Newton held when he was associated with the Camp, and could not give rise to vicarious liability even if that association was intact when the crime occurred. *See Dragomir*, 2009 ME 51, ¶ 13, 970 A.2d 310, 314 (citing Restatement (Second) of Agency § 228) (no vicarious liability because sexual acts were "not the kind of conduct [the therapist] was employed to perform").

**The entry is:**

Defendant Camp Sunshine at Sebago Lake, Inc.'s motion for summary judgment on the issues of liability is **granted**. Absent liability, the Court does not reach the question of whether Camp Sunshine is entitled to charitable immunity.

DATE: _June 15, 2010_

Roland A. Cole
Justice, Superior Court

17

---

01 0000007836        MARJERISON, THOMAS
    415 CONGRESS STREET PO BOX 4600 PORTLAND ME 04112-4600
    F     CAMP SUNSHINE AT SEBAGO LAKE INC-SUMMARY DEF     RTND    06/27/2008

02 0000002208        WADE, STEPHEN
    95 MAIN STREET PO BOX 3200 AUBURN ME 04212-3200
    F     KATIE GNIADEK                              PL      RTND    06/06/2008

03 0000009295        FRENETTE, MARC N
    95 MAIN STREET PO BOX 3200 AUBURN ME 04212-3200
    F     KATIE GNIADEK                              PL      RTND    06/06/2008